**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

—————————————————————

KYLE CANNON, LEWIS LYONS,　　　　　　 )
AND DIANNE LYONS, *individually and* 　 )
*on behalf of a class of similarly situated* )
*persons*, 　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　Plaintiffs, 　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　v. 　　　　　　　　　　　　　 )　　　Civil Action No. 16-1452 (RMB/AMD)
　　　　　　　　　　　　　　　　　　　 )
ASHBURN CORPORATION, *et al.*, 　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　Defendants. 　　 )
—————————————————————)

**STATEMENT OF INTEREST OF THE UNITED STATES**

# TABLE OF CONTENTS

LEGAL STANDARD ...................................................................................................................2

I.    Appearance of the United States ......................................................................................2

II.   Coupon Settlements and CAFA ......................................................................................3

FACTUAL AND PROCEDURAL BACKGROUND ..................................................................4

ARGUMENT .................................................................................................................................7

I.    The proposed settlement provides an unreasonable payout to class counsel for
pursuing claims lacking a basis in consumer harm. ........................................................7

II.   Even if consumers were harmed, limited-value coupons do not fairly, reasonably,
and adequately compensate consumer claimants. ...........................................................8

     A.    The "credits" are coupons under CAFA. ............................................................8

     B.    The settlement is not fair, adequate, and reasonable because the coupons
provide little value to consumers. ........................................................................9

     C.    If the Court approves a coupon settlement, the Court should defer full
payment of fees to class counsel until the value of the redeemed coupons
is known. ............................................................................................................16

CONCLUSION ............................................................................................................................17

## Table of Authorities

**Cases**

*In re Aqua Dots Prods. Liab. Litig.*,
  654 F.3d 748 (7th Cir. 2011) ..................................................................... 3

*In re Baby Prods. Antitrust Litig.*,
  708 F.3d 163 (3d Cir. 2013) ................................................. 2, 14, 15, 17

*Cannon v. Ashburn Corp.*,
  No. 16-1452, 2016 WL 7130913 (D.N.J. Dec. 7, 2016) .................................... 5, 6

*Clement v. Am. Honda Fin. Corp.*,
  176 F.R.D. 15 (D. Conn. 1997) ...................................................................... 11

*Davis v. Cole Haan, Inc.*,
  No. 11-cv-01826-JSW, 2015 WL 7015328 (N.D. Cal. Nov. 12, 2015) ............................... 11

*In re EasySaver Rewards Litig.*,
  921 F. Supp. 2d 1040 (S.D. Cal. 2013) ............................................................ 11

*Eubank v. Pella Corp.*,
  753 F.3d 718 (7th Cir. 2014) .................................................................. 3-4, 9

*Figueroa v. Sharper Image Corp.*,
  517 F. Supp. 2d 1292 (S.D. Fla. 2007) ........................................................... 10

*Fitzgerald v. Gann Law Books*,
  No. 2:11-04287, 2014 U.S. Dist. LEXIS 174567 (D.N.J. Dec. 17, 2014) ........................... 15

*Galloway v. Kan. City Landsmen, LLC*,
  833 F.3d 969 (8th Cir. 2016) ................................................................. 15, 16

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) .................................................................. 9, 10, 11

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975) ...................................................................... 9

*In re HP Inkjet Printer Litig.*,
  716 F.3d 1173 (9th Cir. 2013) ................................................................ 3-4, 8, 16

*Martina v. L.A. Fitness Int'l, LLC*,
  No. 2:12-cv-2063, 2013 WL 5567157 (D.N.J. Oct. 8, 2013) ......................................... 8

*In re Mexico Money Transfer Litig.*,
  267 F.3d 743 (7th Cir. 2001) ................................................................. 13, 14

*Pearson v. NBTY, Inc.*,
  772 F.3d 778 (7th Cir. 2014) ................................................................. 3-4, 10

*Radosti v. Envision EMI*,
   717 F. Supp. 2d 37 (D.D.C. 2010) ...................................................................... 8

*Sobel v. Hertz Corp.*,
   No. 3:06-cv-545, 2011 WL 2559565 (D. Nev. June 27, 2011) ............................ 6

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*,
   869 F.3d 551 (7th Cir. 2017) ............................................................................... 3

*In re Sw. Airlines Voucher Litig.*,
   799 F.3d 701 (7th Cir. 2015) ......................................................................... 11, 16

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646 (7th Cir. 2006) ........................................................................... 8, 10

*Tanoh v. Dow Chem. Co.*,
   561 F.3d 945 (9th Cir. 2009) ............................................................................... 3

*True v. Am. Honda Motor Co.*,
   749 F. Supp. 2d 1052 (C.D. Cal. 2010) ............................................................... 4

*In re Walgreen Co. Stockholder Litig.*,
   832 F.3d 718 (7th Cir. 2016) ............................................................................... 12

**Statutes & Rules**

28 U.S.C. § 517 ................................................................................................... 2

28 U.S.C. § 1712 .................................................................................. 1, 4, 15, 16

28 U.S.C. § 1715 ................................................................................................. 2

Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711–1715 ............................ 1

Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4, § 2(a) (2005) ...................... 3

Fed. R. Civ. P. 23 ................................................................................................ 1

**Other**

Hon. Barbara J. Rothstein & Thomas E. Willging, Managing Class Action Litigation:
   A Pocket Guide for Judges (3d ed. 2010)................................................ *passim*

Eric Asimov, *Wines Are No Longer Free to Travel Across State Lines*,
   NYTimes, Oct. 23, 2017 ..................................................................................... 12

James Tharin & Brian Blockovich, *Coupons and the Class Action Fairness Act*,
   18 Geo. J. Legal Ethics 1443, 1445, 1448 (2005) ............................................. 15

Manual for Complex Litigation § 21.71 (4th ed. 2008) ...................................... 16

"The Class Action Fairness Act of 2005,"
   S. Rep. 109-14 (2005) ...................................................................... *passim*

The United States respectfully urges the Court to reject the proposed class action settlement in this case.  The proposed settlement provides extremely limited value to consumers and yet seeks to transfer a massive $1.7 million windfall payment to plaintiffs' counsel.  That is not appropriate.  Either plaintiffs' claims are strong, in which case a settlement that has meaningful value to the class is required, or plaintiffs' claims are meritless, in which case their counsel is not entitled to a massive fee.  Settlements must be fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e)(2); 28 U.S.C. § 1712(e).  The settlement at issue here is not and the Court should reject it.

The United States, through the Department of Justice's Consumer Protection Branch, is an interested party here under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711–15 ("CAFA").  The Consumer Protection Branch litigates consumer-fraud enforcement actions on behalf of the United States and thus has expertise in both identifying consumer frauds and crafting appropriate consumer remedies.  But this case seemingly has neither.  Based on the allegations in the complaint, it is difficult to discern any actual harm to consumer class members from Defendants' alleged marketing practices.  The parties agree that claimants actually received the products they ordered at the prices to which they agreed.  Whatever "original price" was advertised, the actual price is what customers willingly paid.  Taken together, these allegations suggest that Defendants' marketing practices harmed consumers at no more than some *de minimis* level.  A suit attacking such insignificant harms does not warrant a $1.7 million in compensation to class counsel.

On the other hand, if the Defendants' practices actually *did* harm their customers, then the proposed settlement is even worse.  It provides the aggrieved plaintiffs with coupons, in the form of rebate codes, of very limited value.  The anticipated coupons would be non-transferable, expire within a year, and are good only for products sold by the Defendants; the coupons could be used

only in unreasonably small increments of $2 per bottle of wine purchased; claimants would need to jump through unnecessary hoops to even receive their rebate code; and some claimants would not be able to use the coupons at all under state law, and thus would need to take additional, affirmative steps to receive a (smaller) cash award.  Given the limited benefits to class members, the large attorney's fees award proposed here is not "consistent with the benefits afforded class members or the amount of real work that the class counsel have performed in connection with the litigation."  "The Class Action Fairness Act of 2005," S. Rep. 109-14 (2005) ("Senate Report") at 5.  At the very least, the Court should award partial fees until the full benefit to the class is known. *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 179 (3d Cir. 2013).

The United States therefore urges the Court to reject the proposed settlement in favor of a resolution that either recognizes the plaintiffs' claims as meritless or offers consumers meaningful relief that justifies granting class counsel's request for a significant fee.

## LEGAL STANDARD

### I.    Appearance of the United States

Congress authorized the Attorney General to send "any officer of the Department of Justice . . . to any State or district in the United States to attend to the interests of the United States in a suit pending in a court in the United States."  28 U.S.C. § 517.  CAFA further requires class-action defendants to notify the Attorney General and state officials of proposed class action settlements.  28 U.S.C. § 1715.  While the CAFA notice provision does not grant any specific authority to, or impose any obligation on, federal or state officials, 28 U.S.C. § 1715(f), its legislative history shows that Congress intended the notice provision to enable public officials to "voice concerns if they believe that the class action settlement is not in the best interest of their citizens."  Senate Report at 28.  Congress expected that CAFA notifications would "provide a check against inequitable settlements" and "deter collusion between class counsel and defendants

to craft settlements that do not benefit injured parties." *Id.* at 33–35.  It is in that spirit that the United States offers its views here.

## II.        Coupon Settlements and CAFA

Congress enacted CAFA to provide adequate notice of class actions to parties, promote consistent application of governing law, and establish a mechanism for class action settlements to provide "meaningful recovery to the class members" as opposed to "simply [a] transfer [of] money from corporations to class counsel."  Senate Report at 4–6; *see also Tanoh v. Dow Chem. Co.*, 561 F.3d 945, 952 (9th Cir. 2009) (noting that CAFA is meant to "curb perceived abuses of the class action device").  In particular, Congress found that certain past class actions had harmed class members who had legitimate claims while leading to large attorney's fees and unjustified awards for plaintiffs' attorneys at the expense of class members.  *See* Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4, § 2(a) (2005).  Along with reforms that enabled parties to more easily bring class action suits to federal court, CAFA included a "Consumer Class Action Bill of Rights" intended "to help ensure that class actions do not hurt their intended beneficiaries . . . address a number of common abuses . . . and to encourage greater judicial scrutiny of proposed class action settlements."  Senate Report at 30.

The CAFA Bill of Rights reflects particular congressional concern with "coupon settlements," which provide eligible class members with coupons or vouchers for future purchases from the defendant.  *Id.* at 20.  Such settlements often provide class members with awards that have little practical value while paying class counsel generous attorney's fees.  *See, e.g.*, *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013) (quoting Senate Report at 29–30).  Coupon settlements "often do not provide meaningful compensation to class members; they often fail to disgorge ill-gotten gains from the defendant; and they often require class members to do future business with the defendant in order to receive compensation."  *True v. Am. Honda Motor*

3

*Co.*, 749 F. Supp. 2d 1052, 1062 (C.D. Cal. 2010) (quoting *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1302 (S.D. Fla. 2007)).   CAFA therefore expressly sets forth guardrails governing coupon settlements.  28 U.S.C. § 1712.  These provisions mandate "judicial scrutiny of coupon settlements" in terms that reference the standard Rule 23(e) inquiry and emphasize that approval of such a settlement requires a hearing and written findings that the settlement is actually fair, reasonable, and adequate.  28 U.S.C. § 1712(e).

### FACTUAL AND PROCEDURAL BACKGROUND

Defendants Ashburn Corporation and its subsidiary, Wines 'Till Sold Out ("WTSO"), operate WTSO.com, a "wine flash-site" that sells bottles of wine on the internet, often advertised at steep discounts.  Compl. [Dkt. # 1] ¶¶ 22-23.  On March 15, 2016, plaintiffs filed a class action lawsuit against Ashburn, WTSO, and wine distributor Jonathan H. Newman.  The complaint alleges violations of New Jersey state law, as well as claims for unjust enrichment, fraud, and breach of contract.[1]

According to the complaint, Defendants engaged in a fraudulent scheme to "advertise false original prices and false discounts for wines sold on the WTSO.com website in order to induce consumers to purchase certain wines."  *Id.* ¶ 2.  Plaintiffs do not allege that they paid more than the advertised price or that they did not receive the wine they purchased; the theory of harm is that plaintiffs did not receive the benefit of their bargain because they were induced to purchase wine by WTSO's allegedly falsely inflated prices.  *See id.* ¶¶ 40–42.  In other words, the core allegation in the complaint is that the bottles that plaintiffs purchased "were of lesser value than the bottles

---

[1]     The claims against Mr. Newman were voluntarily dismissed on May 10, 2016.  Stipulation of Dismissal [Dkt. # 11].

4

advertised." *Cannon v. Ashburn Corp.*, No. 16-1452, 2016 WL 7130913, at *8 (D.N.J. Dec. 7, 2016).

On December 7, 2016, the Court granted in part and denied in part Defendants' motion to dismiss the complaint, which was based in part on a challenge to the lack of ascertainable loss. *Id.* at *8, *12.  As the Court put it, plaintiffs alleged "by a slim margin" that defendants' practices caused an ascertainable loss to plaintiffs as to state law fraud claims, and it noted that discovery would "elucidate the amount of the Plaintiffs' alleged ascertainable loss, if any." *Id.* at *8.

On June 28, 2017, the parties jointly moved for preliminary approval of a settlement agreement, Joint Mot. For Prelim. Approval of Class Settlement [Dkt. # 38], and they filed a revised settlement agreement on November 10, 2017.  Revised Settlement Agreement & Release [Dkt. # 43-1] ("Settlement").  The Court granted preliminary approval of the revised settlement on November 16, 2017.  Order [Dkt. # 44].  A Fairness Hearing is scheduled for March 19, 2018, at 10:00 a.m. *See id.* at 5.

Under the settlement agreement, a putative class member must submit a verification form to the Settlement Administrator either online or by mail within 30 days of the fairness hearing. Settlement § IV.D.  The verification form requires a class member to verify his or her contact information, certify that the consumer purchased a bottle of wine from defendants during the relevant time period, and verify any refunds received for those wines. *Id.*; *see also* Ex. G to Settlement [Dkt. # 43-8] ("Verification Form").[2]  After receiving the Verification Forms, WTSO will send a unique and non-transferable code to each class member who submitted a "valid" form. *Id.* § IV.G.

---

2      Defendants have promised to maintain their customers' ability to view their order history on their website.  Settlement § IV.I.

Claimants may use these non-transferable codes to access "credits towards future purchases of wine" through the Defendants' website. Settlement §§ IV.A, IV.G. The value of each claimant's total credit would depend on their past purchases from WTSO; generally credits would range from $0.20 to $2.25 per bottle of wine previously purchased. *Id.* § IV.A. The credits could be applied against future purchases of select wines from WTSO, referred to in the settlement agreement as "Redemption Wines." *Id.* § IV.B, IV.C. WTSO agrees that the list of "Redemption Wines" would include at least 700 bottles of wine at any given time, although the settlement agreement does not specify the type or value of the "Redemption Wines." *Id.* The credits would be valid for a period of one year.

Significantly, claimants could not use the entirety of their credit to offset a single purchase. Instead, class members could redeem only a maximum of $2.00 worth of credit per bottle purchased. *Id.* § IV.B. The proposed settlement also states that if "WTSO is not able to ship" to a claimant's address during the "Redemption Period," that claimant can contact WTSO within 60 days to request a cash refund worth 50 percent of the claimant's credit. Settlement Agreement § IV.J. The settlement and related website do not explain why WTSO would not be able to ship to certain claimants, but this provision appears to be aimed at compensating consumers who made prior purchases but live in states that restrict the interstate shipment of wine. *See* Letter from Keith Brown [Dkt. # 51] (withdrawing objection that Texas state law would forbid WTSO from shipping wine to class member because lawyers for plaintiffs pointed consumer to a document "that explains a provision for cash settlement for class members to whom WTSO cannot ship wine to if/when the settlement is approved").

The parties estimate that the "total value" of the credits to be provided to the settlement class is approximately $10.8 million, but they do not explain how they arrived at that figure. Settlement § IV.A.

## ARGUMENT

## I.   The proposed settlement provides an unreasonable payout to class counsel for pursuing claims lacking a basis in consumer harm.

Plaintiffs do not allege that they ever received a different bottle of wine than what they ordered; rather, they allege bamboozlement over the advertised "original price." Instead of ending deception or compensating wronged consumers, therefore, the "principal effect" of the proposed settlement appears intended to "induce the defendants to pay the class lawyers enough to make them go away." *In re Subway Footlong Sandwich Mktg. & Sales Practices Litig., 86*9 F.3d 551, 556 (7th Cir. 2017) (quoting In r*e Aqua Dots Prods. Liab. Litig., 65*4 F.3d 748, 752–53 (7th Cir. 2011)). Congress passed section 1712 of CAFA to address this sort of "judicial blackmail," which "forces corporate defendants to pay ransom to class attorneys by settling – rather than litigating – frivolous lawsuits." Senate Report at 20; *see also id.* at 16–20 (listing examples of coupon settlements "in which most – if not all – of the monetary benefits went to the class counsel, rather than the class members those attorneys were supposed to be representing"). Because class counsel and the defendant have strong incentives to "sell out the class" in favor of a deal that promotes the narrow "self-interest of both class counsel and the defendant," it falls on courts to be "vigilant and realistic" in reviewing class action settlements. *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (quoting *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014)). "Indeed, if the legislative history of CAFA clarifies one thing, it is this: the attorneys' fees provisions of § 1712 are intended to put an end to the 'inequities' that arise when class counsel receive attorneys' fees

that are grossly disproportionate to the actual value of the coupon relief obtained for the class."

*HP Inkjet*, 716 F.3d at 1179 (citing Senate Report at 29–32).

**II.     Even if consumers were harmed, limited-value coupons do not fairly, reasonably, and adequately compensate consumer claimants.**

**A.     The "credits" are coupons under CAFA.**

As an initial matter, the "credits" contemplated here are clearly "coupons" within the meaning of CAFA.  While CAFA does not define "coupon," the legislative history supports the commonsense conclusion that a coupon is a discount on products or services offered by the defendant.  *See* Senate Report at 15 (citing with disapproval class action settlements in state courts where "class members receive nothing more than promotional coupons to purchase more products from the defendants").  Commentators and courts have agreed with that basic formulation.  *See* Newberg On Class Actions § 12:11 (5th ed.); *see also Radosti v. Envision EMI*, 717 F. Supp. 2d 37, 54 n.16 (D.D.C. 2010) ("Although Congress did not define the term 'coupon' in the statute, courts have generally considered a coupon settlement to be one that provides benefits to class members in the form of a discount towards the purchase of a product or service offered by the defendant.").

The key characteristic of a coupon – and the one that makes its worth to class members so suspect – is that it "force[s] future business with the defendant."  *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006); *Martina v. L.A. Fitness Int'l, LLC*, No. 2:12-cv-2063, 2013 WL 5567157, at *4 (D.N.J. Oct. 8, 2013) (Walls, J.) (finding a $100 credit towards a gym membership to be a coupon because "[i]t is a credit which requires class members to spend money in order to realize the benefit").  In this case, class members would receive "credits" on future purchases of wine, requiring those consumers to engage in future business with

the very defendant who allegedly harmed them.  That is a textbook coupon settlement, which means the Court should give particular scrutiny to it.

### B.     The settlement is not fair, adequate, and reasonable because the coupons provide little value to consumers.

The proponents of a settlement bear the burden of proving that it is fair, adequate, and reasonable.  *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995).  They cannot satisfy their burden in this case.

The Third Circuit has adopted nine factors for courts to consider when assessing whether a settlement is fair, adequate, and reasonable:

> (1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . . .; (3) the stage of the proceedings and the amount of discovery completed . . .; (4) the risks of establishing liability . . .; (5) the risks of establishing damages . . .; (6) the risks of maintaining the class action through the trial . . .; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . .; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (alterations in original)) (the "*Girsh* factors").

The United States takes no position on whether a settlement in this case worth $10.8 million would satisfy the *Girsh* factors.  As explained further below, however, the proposed settlement offers coupons of such little value that the settlement's actual value is far below the $10.8 million value that the parties assign to it.  The Court must analyze the true value when assessing the settlement under the *Girsh* framework.

In general, coupon settlements are "a warning sign of a questionable settlement."  *Eubank*, 753 F.3d at 725.  Coupons cannot be pocketed like cash and are valuable only if plaintiffs choose to engage in additional transactions.  Settlements involving them thus present an enhanced risk that "some percentage of the [coupon] claimed by class members will never be used and, as a

9

result, will not constitute a cost to [defendant]." *Synfuel Techs.*, 463 F.3d at 654.  Courts thus sometimes reject such settlements, especially without more information about the coupon's true monetary value.  *See, e.g.*, *Figueroa*, 517 F. Supp. 2d at 1329  (rejecting a settlement that provided class members with $19 coupons to be used at defendant's retail store because, among other reasons, the settlement failed to disgorge defendant of ill-gotten gains, and because very few class members were likely to redeem the coupons); *Sobel v. Hertz Corp.*, No. 3:06-cv-545, 2011 WL 2559565 (D. Nev. June 27, 2011) (rejecting coupon settlement and noting that the fact that the coupons "may only be redeemed with the issuing defendant" forces class members "to do additional business with the very defendants that wronged them").

The Third Circuit's opinion in *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation* carefully explains the problems inherent to coupon settlements.  In that case, a class of more than six million consumers sued after their General Motors pick-up trucks turned out to have a design defect in the location of their fuel tanks.  55 F.3d at 777.  The company agreed to settle the lawsuit by offering either $1,000 coupons redeemable towards the purchase of a Chevrolet or General Motors truck purchased from a dealership, or $500 coupons redeemable towards the purchase of a truck not purchased from the dealership.  *Id.* at 780.

The district court approved the settlement, but the Third Circuit reversed, criticizing the District Court for "ignor[ing] the fact that the coupons provided no cash value and made no provision for repairing the allegedly life-threatening defect."  *Id.* at 806-07.  The Court of Appeals agreed with objectors that the district court had "overvalued the settlement" and held that "the proffered settlement was, in reality, a sophisticated [General Motors] marketing program," because some consumers would feel "beholden to use the certificates" to buy more products from defendants, which would result in a "tremendous sales bonanza" for General Motors.  *Id.* at 807–

08. The coupons contemplated here are similar; the various strings attached make them worth far more to Defendants as a marketing tool than to consumers as true compensation for claimed wrongs. *See* Senate Report at 16 (describing how some "coupons are a promotional opportunity and not a penalty").

The restrictive nature of coupons calls for special consideration when assessing whether a coupon settlement is fair, adequate, and reasonable, such as:  (1) whether the coupons are transferable to other consumers, (2) whether a secondary market exists where they could be converted to cash, (3) whether the coupon compares favorably with other bargains generally available, and (4) whether it is likely that class members would actually redeem the coupons. *See* Hon. Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation:  A Pocket Guide for Judges* (3d ed. 2010) ("Rothstein et al."), at 17–18, https://www.fjc.gov/sites/default/ files/2012/ClassGd3.pdf.[3]  In this case, all of these factors highlight the low value of the coupon settlement to the class members.

*First*, the credits would be non-transferable to other consumers, which significantly limits their utility. *See In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 706 (7th Cir. 2015) (noting in a coupon case that "the potential for abuse is greatest when the coupons have value only if a class member is willing to do business again with the defendant who has injured her in some way, when the coupons have modest value compared to the new purchase for which they must be used, and when the coupons expire soon, are not transferable, and/or cannot be aggregated"); *cf. In re EasySaver Rewards Litig.*, 921 F. Supp. 2d 1040, 1049 (S.D. Cal. 2013) (approving coupon

---

3       The Federal Judicial Center's class action guide echoes the concern with coupon settlements, noting that they are a "hot button indicator[]" of a settlement term that "show[s] [its] potential unfairness on [its] face."  Rothstein et al. at 17.

settlement where "the $20 credits here are transferrable and may be used to purchase entire items without requiring the class members to spend additional money").

*Second*, only a subset of the class members can convert their coupons to cash, and even those who are eligible must clear a number of hurdles in order to do so. The proposed settlement explains that if "WTSO is not able to ship" to a claimant's address, then the consumer "may contact WTSO within 60 days of the Effective Date [of the settlement] to request that WTSO pay that Class Member in cash 50% of the amount of the Credits received by that Class Member." Settlement § IV.J. There is no other opportunity for class members to convert their coupons to cash.

Neither the settlement website nor the Notice of Settlement provides additional guidance about who would or would not be eligible to convert coupons to cash.[4] Neither the proposed settlement, nor WTSO's website, discloses the states to which the company ships and does not ship. The company's online FAQ simply states that "shipping wine is complicated," and directs specific questions to the company's customer service department. *See* "Where Do You Ship," https://www.wtso.com/faqs. Under these terms, the onus is on the consumer to (1) know that he or she is entitled to a credit; (2) learn whether interstate shipments of alcohol are prohibited in the consumer's state (*e.g.*, by calling WTSO to find out or attempting to purchase WTSO wine); and (3) affirmatively reach out to the company to request a cash payout within a limited time period. WTSO is in a far better position than potential class members to know whether a particular

---

4      The New York Times recently reported that only fourteen states allow the interstate purchase of wine. Eric Asimov, *Wines Are No Longer Free to Travel Across State Lines*, NYTimes, Oct. 23, 2017, https://www.nytimes.com/2017/10/23/dining/drinks/interstate-wine-sales-shipping-laws.html. The National Conference of State Legislatures publishes an online guide to state laws relating to out-of-state shipments of alcoholic beverages. *See* http://www.ncsl.org/research/financial-services-and-commerce/direct-shipment-of-alcohol-state-statutes.aspx.

claimant or group of claimants are entitled to cash payments.  Yet the proposed settlement makes no provision for simply paying cash to claimants in affected states without first requiring those claimants to run the above-described bureaucratic obstacle course.  These procedures do little other than deter claims for cash.

*Third*, the coupons do not compare favorably with other potential bargains.  The coupons would expire in one year and class members could only use them in increments of $2 per bottle of wine.  Settlement §§ IV.B, IV.G.  The actual value of each coupon is even less than $2, because each coupon's utility is tightly restricted.  *See, e.g.*, *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001) ("[C]ompensation in kind is worth less than cash of the same nominal value.").  The value of these particular coupons is further degraded by the severe restrictions attached to them.  The coupons are applicable only towards the purchase of (as-yet-unknown) "Redemption Wines."[5]  The proposed settlement does not explain why claimants should not be able to use their $2 coupons for *any* product offered by WTSO.

*Fourth*, many consumers seem unlikely to redeem any, much less all, of their coupons.  As a starting point, the very process for class members to claim coupons imposes unnecessary obstacles that reduce the likelihood of coupon redemption.  Claimants must affirmatively submit a verification form with their contact information, a certification that they purchased wine from WTSO during a particular time frame, and a list of any wines for which they previously received refunds.  Ex. G to Settlement [Dkt. # 43-8].  If a claim form is "incomplete"– if, say, a claimant

---

[5]     WTSO has promised to make "700 of the 'current offers' on the WTSO.com website, and at least six (6) million bottles available for purchase as 'current offers,'" available as Redemption Wines.  Settlement § IV.C.  They also promise that Redemption Wines will encompass "[o]n a monthly basis, at least 30 of the 'current offers' on the WTSO website, and at least 250,000 bottles available for purchase as 'current offers.'"  *Id.*  The difference between those four figures is not clear from the Settlement or the motion for preliminary approval.

failed to include accurate information about any refunds – it apparently may be "rejected" unless and until the consumer submits "a corrected completed Verification Form."  Settlement § IV.D. Then, after receiving their rebate code, claimants must input that code back into the website during their next order.  *Id.* § IV.G.

This process seems designed to stymie consumers and prevent them from redeeming their coupons.  The Defendants already have a comprehensive database of their customers and associated order histories, *see id.* § IV.I, and are thus in possession of all the information the Verification Form requests.  Defendants could, if they wanted, automatically load the rebate information into each claimant's account.  While the law permits claim forms that are not overly onerous, *see, e.g.,* P*earson,* 772 F.3d at 783, the steps here seem geared toward simply reducing the potential number of claimants.

Furthermore, were class members to navigate the coupon claiming process successfully, they face additional challenges in actually using the coupons.  Assuming $10.8 million in credits, *id.* § IV.A, and 243,789 potential class members, the average class member would receive approximately $44 in credits.  The average claimant thus would be required to purchase – from the same Defendants who supposedly wronged them – at least 22 bottles of wine within one year, paying the full cost over $2 for every purchased bottle.  The settlement therefore would compel claimants to spend significant additional money at WTSO to receive their $2 benefit for each bottle purchased.

The low number of anticipated coupons that will actually be claimed and redeemed illustrates the limited value this coupon settlement offers to the class members.  Courts must consider whether a settlement "provides sufficient direct benefit to the class before giving its approval."  *Baby Prods.*, 708 F.3d at 170.  The estimated value of a settlement cannot be inflated

14

by including unclaimed portions that "effectively revert[] to the defendant[s]." *Fitzgerald v. Gann Law Books*, No. 2:11-04287, 2014 U.S. Dist. LEXIS 174567 at *27 (D.N.J. Dec. 17, 2014).

As noted in the Federal Judicial Center guide, "[d]etermining the precise value to the class of the rare beneficial coupon settlement . . . calls for hard data on class members' redemption of the coupons." Rothstein et al. at 18. No such hard data has been submitted to date, and no party has moved to present expert testimony on the matter. *See* 28 U.S.C. § 1712(d) ("In a class action involving the awarding of coupons, the court may, in its discretion upon the motion of a party, receive expert testimony from a witness qualified to provide information on the actual value to the class members of the coupons that are redeemed."). Redemption rates in other cases traditionally have been very low. *See, e.g.*, *Galloway v. Kan. City Landsmen, LLC*, 833 F.3d 969, 971 (8th Cir. 2016) (redemption rate of 0.045%); *Davis v. Cole Haan, Inc.*, No. 11-cv-01826-JSW, 2015 WL 7015328, at *2 (N.D. Cal. Nov. 12, 2015) (noting that 336 of 13,918 class members redeemed voucher, or 2.4%); James Tharin & Brian Blockovich, *Coupons and the Class Action Fairness Act*, 18 Geo. J. Legal Ethics 1443, 1445, 1448 (2005) (explaining that coupon redemption rates in settlements are "tiny" and "mirror the annual corporate issued promotional coupon redemption rates of 1-3%"); *see also Clement v. Am. Honda Fin. Corp.*, 176 F.R.D. 15, 28 (D. Conn. 1997) (rejecting coupon settlement because "[t]he value of these coupons is too speculative. Absent a transfer option or some guarantee of some minimal cash payment, there is a strong danger that the settlement will have absolutely no value to the class"). Understanding the direct benefit to the class "may also require a court to withhold final approval of a settlement until the actual distribution of funds can be estimated with reasonable accuracy." *Baby Prods.*, 708 F.3d at 174.

As the Seventh Circuit has stated, class action settlements that "seek[] only worthless benefits for the class" and "yield[] [only] fees for class counsel" are "no better than a racket" that

"should be dismissed out of hand." *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718 (7th Cir. 2016). While the proposed class benefits in this case are not as "worthless" as those in *Walgreen*, the aggregate likely value of the coupons here is low, and this Court should reject this settlement.

**C.     If the Court approves a coupon settlement, the Court should defer full payment of fees to class counsel until the value of the redeemed coupons is known.**

While class counsel uses the lodestar method[6] as a "cross-check" on the attorney fees amount, counsel also argues that the requested fee "represents a small percentage of the total value of the benefit created for the class." Class Counsel's Brief in Supp. App. For Award of Attys' Fees & Reimbursement of Expenses [Dkt. # 47] at 1. As explained above, this statement is not accurate, because the true total benefit to the class of this settlement is likely much lower than $10.8 million. To the extent attorney's fees are contingent in coupon settlements, CAFA requires "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons [to be] based on the value to class members of the coupons that are *redeemed*." 28 U.S.C. § 1712(a) (emphasis added). Even where attorneys seek a non-contingent cash award in a coupon settlement, the court should "carefully scrutinize" the agreement and "refuse to allow attorneys to receive fees based on an inflated or arbitrary evaluation of the benefits to be delivered to class members." Federal Judicial Center, Manual for Complex Litigation § 21.71 (4th ed. 2008). Either way, it is inappropriate to award significant attorney's fees before understanding the actual value to class members of redeemed WTSO coupons.

---

6     There is a circuit split on the question of whether the lodestar method is permissible at all in a coupon-settlement case. *Compare HP Inkjet*, 716 F.3d at 1183–85 *with Sw. Airlines*, 799 F.3d at 707 (disagreeing with the *HP Inkjet* decision, and holding that "[s]ubsections (a) and (b) [of 28 U.S.C. § 1712] . . . fit together to force a choice between the lodestar method and a percentage of coupons redeemed") *and Galloway*, 833 F.3d at 975 (agreeing with Southwest Airlines).

This careful approach to attorney's fees in coupon settlements is consistent with guidance from the Third Circuit, which has advised more generally that "[i]n evaluating a fee award, [district courts] should begin by determining with reasonable accuracy the distribution of funds that will result from the claims process.  This may require [a court] 'to delay a final assessment of the fee award to withhold all or a substantial part of the fee until the distribution process is complete.'"  *Baby Prods.*, 708 F.3d at 179 (quoting Manual for Complex Litigation § 21.71).  Given the severe restrictions on claiming and redeeming the proposed coupons, if this Court approves a coupon settlement, it should delay final assessment of a fee award until the process for redeeming coupons is complete.

## CONCLUSION

The Court should reject the proposed settlement.  Under the terms of the agreement, consumers gain nothing beyond a chance to buy more wine from the Defendants at a miniscule discount and then only if they successfully navigate the unnecessarily complex process the proposed settlement erects.  Class counsel, meanwhile, have requested a $1.7 million cash payment – a significant amount that far outweighs the meager offering to class members.

Counsel for the United States will be available for the Fairness Hearing in this matter, currently set for March 19, 2018.  The United States respectfully requests the opportunity to be heard, as well as to address any questions that the Court may have about its position in this matter.

February 16, 2018                    Respectfully submitted,

                                     CHAD A. READLER
                                     Acting Assistant Attorney General

                                     ETHAN P. DAVIS
                                     Deputy Assistant Attorney General

                                     GUSTAV W. EYLER
                                     Acting Director
                                     Consumer Protection Branch


                                     _____/s/ Joshua D. Rothman_____
                                     Joshua D. Rothman
                                     Trial Attorney
                                     Consumer Protection Branch
                                     Department of Justice, Civil Division
                                     P.O. Box 386
                                     Washington, D.C. 20044
                                     202-514-1586
                                     Joshua.D.Rothman@usdoj.gov

                                     *Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of February, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of New Jersey using the CM/ECF system.  All counsel will be notified through that system.

  /s/ Joshua D. Rothman  
Joshua D. Rothman
Trial Attorney