# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| KYLE CANNON, LEWIS LYONS, and DIANE LYONS, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Civil No. 16-1452 (RMB/AMD) |
| v. | **OPINION** |
| ASHBURN CORPORATION, WINES 'TIL SOLD OUT (WTSO.COM), and JONATHAN H. NEWMAN, | |
| Defendants. | |

APPEARANCES:

CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
By:  James E. Cecchi, Esq.
     Lindsey H. Taylor, Esq.
5 Becker Farm Road
Roseland, New Jersey 07068

     and

GISKAN SOLOTAROFF ANDERSON LLP
By:  Oren Giskan, Esq.
217 Centre Street, 6th Floor
New York, New York 10013
         Counsel for Plaintiffs

MANKO, GOLD, KATCHER & FOX, LLP
By:  Suzanne Ilene Schiller, Esq.
     Nicole R. Moshang, Esq.
     James M. McClammer, Esq.
401 City Avenue, Suite 901
Bala Cynwyd, Pennsylvania 19004

     and

LATHAM & WATKINS LLP
By:   James J. Farrell, Esq.
      Gregory Mortenson, Esq.
885 Third Avenue
New York, New York 10022
          Counsel for Defendants

U.S. DEPARTMENT OF JUSTICE, CONSUMER PROTECTION BRANCH
By:   Gustav W. Eyler, Esq.
      Joshua D. Rothman, Esq.
P.O. Box 386
Washington, D.C. 20044
          Counsel for Interested Party the United States

MARK BRNOVICH, ATTORNEY GENERAL FOR THE STATE OF ARIZONA
By:   Oramel H. Skinner, Esq.
2005 North Central Avenue
Phoenix, Arizona 85004
          Counsel for *Amicus Curiae* Arizona Attorney General on
          behalf of the Attorneys General of Arizona, Alabama,
          Arkansas, Idaho, Indiana, Louisiana, Michigan,
          Mississippi, Missouri, Nevada, North Dakota, Ohio,
          Oklahoma, Rhode Island, South Carolina, South Dakota,
          Texas, Washington, and Wyoming

FINEMAN, KREKSTEIN & HARRIS, P.C.
By:   Richard J. Perr, Esq.
      Monica M. Littman, Esq.
1801 Market Street, Suite 1100
Philadelphia, Pennsylvania 19103

      and

MANSOUR GAVIN LPA
By:   Brendon P. Friesen, Esq.
      Kenneth E. Smith, Esq.
1001 Lakeside Avenue, Suite 1400
Cleveland, Ohio 44114
          Counsel for Objectors Derek Hansen, Vytauras Sasnauskas,
          and Ryan Russell

DILWORTH PAXSON LLP
By:   Joshua Wolson, Esq.
1500 Market Street, Suite 3500E
Philadelphia, Pennsylvania 19102

      and

COMPETITIVE ENTERPRISE INSTITUTE
By:  Adam Schulman, Esq.
1310 L Street, NW 7th Floor
Washington, D.C. 20005
          Counsel for Objector Ryan Radia

EDWARD TAHIR DUCKETT, *pro se*
1355 Shepherd Street, NW #3
Washington, D.C. 20011
          Objector

PATRICK DEAN TAYLOR, *pro se*
311 E. Wabash Avenue
Crawfordsville, Indiana 47933
          Objector

STEVEN D. MAYER, *pro se*
3730 N. Lake Shore Drive, Apt. 10A
Chicago, Illinois 60613
          Objector

WILLIAM B. JAMES, *pro se*
3675 Classic Drive S
Memphis, Tennessee 38125
          Objector

KENDALL M. COX, *pro se*
203 Chamberlain Drive
Dekalb, Illinois 60115
          Objector

KEITH BROWN, *pro se*
8519 Blueberry Circle
Lago Vista, Texas 78645
          Objector

MARI STULL, *pro se*
205 Cameron Street
Alexandria, Virginia 22314
          Objector

**BUMB**, UNITED STATES DISTRICT JUDGE:

When presented with a motion to approve a class action settlement, a district court has a particularly important, and frequently challenging, task: to probe thoughtfully beneath the surface of a jointly proposed settlement and ask questions. If, at the end of its inquiry, the court has more questions than answers, there is more work to do. How can a court determine, with a reasonable amount of certainty, that the proposed settlement is fair, reasonable, and adequate under Fed. R. Civ. P. 23(e), when it has many unanswered questions? It cannot, and must not. See In re Baby Prod. Antitrust Litig., 708 F.3d 163, 175 (3d Cir. 2013) ("district judges presiding over [class] actions are expected to give careful scrutiny to the terms of proposed settlement."). Because this Court is left with so many unanswered questions here, the parties' Joint Motion for Final Settlement Approval will be denied.[1]

---

[1] As is customary, the parties have asked the Court to simultaneously certify the proposed settlement class and approve the settlement. As discussed in this Opinion, the Court has reservations about whether the proposed settlement class may be certified. However, in light of the Court's holding with respect to the proposed settlement, the Court does not rule on the certification issue.

## I. FACTS AND PROCEDURAL HISTORY

### A. **The Complaint**

As alleged in the Complaint, Defendant Wines 'Til Sold Out sells wine exclusively through its "flash-site" website, WTSO.com.[2] Plaintiffs, alleged customers of Wines 'Til Sold Out, assert that during the proposed class period[3], Wines 'Til Sold Out "advertise[d] false original prices and false discounts for sold on the WTSO.com website in order to induce consumers to purchase certain wines." (Compl. ¶ 2)  The Complaint identifies two different allegedly deceptive schemes-- one related to wines exclusively available on WTSO.com and unavailable from any other seller (even directly from the winery); and another related to wines available elsewhere, although allegedly at prices different than what Wines 'Til Sold Out represented.

As to the first category, the Complaint alleges that the "Original Price" listed on WTSO.com was false simply because there

---

[2]  The Complaint alleges that "Wines 'Til Sold Out is a subsidiary of [Defendant] Ashburn [Corporation]." (Compl. ¶ 20) For the purposes of the instant motion, the parties make no distinction between Wines 'Til Sold Out and Ashburn, which are represented by the same counsel.  The Court will follow the parties' approach and simply refer to Wines 'Til Sold Out.  A third Defendant, Jonathan H. Newman, was dismissed from this suit by stipulation in May, 2016.

[3]  The class period extends back to "a date no later than six years prior to the filing date of this action, or the date Defendants first employed their scheme to deceive, misrepresent or otherwise omit material facts in selling the wines at issue on the WTSO.com website." (Compl. ¶ 47)

was a comparison of prices at all. According to Plaintiffs, the "private label" wines sold in this category could have had only one possible price-- the price WTSO.com was selling the wine at-- and any other representation of an "Original Price" or "Best Web Price" was allegedly fraudulent because it necessarily implied the existence of a nonexistent comparator price offered by a nonexistent seller. (Compl. ¶ 33)

As to the second category, the Complaint alleges that Wines 'Til Sold Out "wild[ly] exaggerate[ed]" Original Prices to give customers the false impression that they were getting a larger discount on the wine they purchased. (Compl. ¶ 36) For example, the Complaint alleges that Wines 'Til Sold Out listed an "Original Price" of $350 a bottle for a wine that Wine Spectator and Wine Enthusiast stated was $225 a bottle. (Id.)

The class proposed in the Complaint is "[a]ll persons who purchased from Defendants wines which were advertised for sale on the WTSO.com website with a fictional, fabricated or inflated 'Original Price.'" (Compl. ¶ 45)

The Complaint originally asserted four claims: (I) violation of New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq. ("NJCFA"); (II) unjust enrichment; (III) fraud; (IV) breach of contract; (V) violation of New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. 56:12-14, et seq. ("TCCWNA").

**B. Defendants' Motion to Dismiss**

Wines 'Til Sold Out moved to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6).  As set forth in <u>Cannon v. Ashburn Corp.</u>, No. CV 16-1452 (RMB/AMD), 2016 WL 7130913 (D.N.J. Dec. 7, 2016), Defendants were largely successful.  The Court dismissed, or dismissed without prejudice with leave to amend, a majority of the claims, leaving only the NJCFA, fraud and breach of contract claims premised on the first theory of liability-- nonexistent comparator price-- to survive.  <u>Id.</u>  Importantly, as to the second theory of liability-- inflated comparator price-- the Court ruled that "Plaintiffs do not have standing to pursue claims under this theory because they have not alleged that they purchased . . . any . . . wines allegedly sold with an inflated or exaggerated original price. . . . This deficiency is fatal . . . to Plaintiffs' standing to pursue these claims."  <u>Id.</u> at *6.

**C. Joint Motion for Preliminary Approval of Class Settlement**

More than six months later, following several extensions of Plaintiffs' time to file an amended complaint, the parties filed a "Joint Motion for Order Granting Preliminary Approval of Class Settlement and Certification of Settlement Class."  Plaintiffs did not file an Amended Complaint, no Rule 16 conference was ever held, and no formal discovery was ever conducted.  The parties, however, have represented to the Court that they did engage in some limited "confirmatory discovery," which involved some

7

document production and at least two "interviews" of a Wines 'Til Sold Out representatives. (Final Approval Hearing Transcript, hereafter "Transcript," p. 81-82)

### (1) The Original Settlement Agreement

The original proposed settlement provides for varying amounts of "Credits"[4] to class members based on whether they purchased wines listed on the Settlement Agreement's Exhibit A, Exhibit B, or not listed, which the latter category the Court, and the parties, have named the "C wines."[5]  The Exhibit A wines correspond to the wines alleged to be the subject of the nonexistent comparator scheme described _supra_; the Exhibit B wines correspond to the wines alleged to be the subject of the alleged inflated comparator price scheme described _supra_, and the C wines correspond to all other wines Wines 'Til Sold Out sold during the class period.  Specifically, the Settlement Agreement provides:

> 1.  For every bottle of Settlement Wine listed on Exhibit "A" purchased during the Class Period for $12.99 or less for which no prior refund was given, the Class Member will receive a Credit of $1.75.

---

[4]  "Credit" is consistently capitalized throughout the Settlement Agreement, suggesting that it is a defined term. However, a definition of "Credit" is conspicuously absent from the Settlement Agreement.

[5]  In the Settlement Agreement the C wines are described as "every other bottle of Settlement Wine," and "Settlement Wines" is defined as "all wines sold by Defendant during the Class Period." (Dkt No. 43-1, p. 8-9 of 29)

2. For every bottle of Settlement Wine listed on Exhibit "A" purchased during the Class Period for $13.00 to $18.99 for which no prior refund was given, the Class Member will receive a Credit of $2.00.

3. For every bottle of Settlement Wine listed on Exhibit "A" purchased during the Class Period for $19.00 or greater for which no prior refund was given, the Class Member will receive a Credit of $2.25.

4. For every bottle of Settlement Wine listed on Exhibit "B" purchased as an individual offering (not as part of a combination package of different wines) during the Class Period for $19.99 or less for which no prior refund was given, the Class Member will receive a Credit of $ 0.50.

5. For every bottle of Settlement Wine listed on Exhibit "B" purchased as an individual offering (not as part of a combination package of different wines) during the Class Period for $20.00 or greater for which no prior refund was given, the Class Member will receive a Credit of $ 0.75.

6. For every other bottle of Settlement Wine purchased during the Class Period for which no prior refund was given, the Class Member will receive a Credit of $ 0.20.

(Dkt No. 43-1, p. 9 of 29)

The Settlement Agreement further provides that Credits only may be used to purchase wine from Wines 'Til Sold Out in the following manner: "Credits will be applied against purchases of any wine the first time it is offered on WTSO.com . . . at the rate of $2.00 off per bottle, or for the full or remaining [C]redit amount if less than $2.00, for a period of one (1) year following the date the Credit codes described in Paragraph G below are emailed to the Class Members (the 'Redemption Period')." (Dkt No. 43-1, p. 9-10 of 29) "To be eligible to receive Credits,

Class Members must submit the Verification Form to the Settlement Administrator online through the Settlement Website or by mail within 30 days after the date of the Fairness Hearing." (Id. at p. 10 of 29)

If Wines 'Til Sold Out is unable to ship wine to a class member's "primary residence" or "business address" during the Redemption Period, the Settlement Agreement provides a cash option for only these no-ship class members: "the Class Member may contact WTSO within 60 days of the Effective Date to request that WTSO pay that Class Member in cash 50% of the amount of the Credits received by that Class Member. WTSO shall provide the cash refund within 30 days of the request." (Id. at p. 12 of 29)

Lastly, with respect to attorney's fees, the Settlement Agreement states, "Class Counsel may request, and Defendant shall not oppose, an award of attorneys' fees and expenses of no more than of One Million and Seven Hundred Thousand Dollars ($1,700,000), which is subject to the Court's approval. The payment by Defendant of the attorneys' fees and expenses is separate from and in addition to the Class Representative Service Awards and relief afforded the Class Members in this Agreement." (Id. at p. 18 of 29)

(2) <u>Preliminary Approval Hearing</u>

The Court held the preliminary approval hearing on November 8, 2017. During the hearing, the Court's and the parties'

discussion focused largely on the Court's concerns regarding the proposed method of sending notice to the class and how the Credits would work.  As to notice, the parties had originally proposed e-mail only notice; however, after discussion with the Court, the parties agreed to revise the proposed settlement to provide for both e-mail and U.S. mail notice, with the additional cost of postage to be deducted from class counsel's proposed fee.

As to the mechanics of the Credits, the focus of the parties'-- and therefore the Court's-- discussion was the two-dollar limitation on the stacking of Credits (i.e., Credits may be in combination up to $2.00 per one bottle of wine) but the parties did not address the impact of the one-year Redemption Period on the two-dollar stacking limit.  As will be discussed in the Court's discussion infra, however, the interaction between these two proposed settlement terms is vitally important to an understanding of the extent to which the proposed settlement will benefit individual class members.

The parties also neglected to direct the Court's attention to at least two other important aspects of the proposed settlement. First, as later became clear, the proposed settlement contained material differences between the class as proposed in the Complaint, and the proposed settlement class.  The Complaint proposed a class encompassing customers who purchased only A and B wines.  The proposed settlement class, however, added an entirely

new group of proposed class members: customers who purchased neither A nor B wines, _i.e._, C wines. The significance of this change, and why it deeply troubles the Court, will be discussed _infra_. Second, the parties also did not adequately address the class certification requirements. In particular, at no time during the preliminary approval hearing, nor in the parties' papers in support of the motion for preliminary certification, did the parties address the interaction between the Court's Opinion on Defendants' Motion to Dismiss and the Motion to Certify the Settlement Class. The significance of these omissions also will be addressed _infra_.

The Court preliminarily certified the proposed settlement class, and preliminarily approved the proposed settlement, by Order dated November 16, 2017.

(3)  Objections to the Class Settlement[6]

Early in January, 2018, the Court started receiving objections from class members, and the potential, indeed, fundamental, problems with the proposed class and the proposed settlement began to surface. By the objection deadline, the Court

---

[6]  "In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number _and vociferousness_ of the objectors." In re Gen. Motors Corp. Pick-Up Truck Prod. Liab. Litig., 55 F.3d 768, 812 (3d Cir. 1995) (emphasis added). In the Court's experience, the objectors in this case qualify as vociferous.

had received ten objections[7], as well as filings by the United

States Department of Justice, Consumer Protection Division, and

the Arizona State Attorney General on behalf of 19 States'

Attorneys General.[8]  All submissions, and the important questions

they raise, will be discussed in detail <u>infra</u>.

(4)   <u>Modifications to the Settlement Agreement</u>

In response to those filings, the parties proposed three

material modifications to the Settlement Agreement, which are

embodied in the "Amendment to Settlement Agreement and Release."

(Dkt No. 83-1) ("the Amended Settlement Agreement").  First, the

parties propose a six-month enlargement of the twelve-month

Redemption Period to eighteen months. (Id. at p. 1 of 10)  Second,

the parties propose a reduction of the attorney's fee award

request from $1.7 million to $1.2 million coupled with a deferral

of the fee application until after the now extended Redemption

Period has expired.  (Id. at p. 2 of 10)  Notably, however, the

Amended Settlement Agreement provides that Class Counsel may

---

[7]   Keith Brown filed an objection which he later withdrew.
The Court does not include his objection in its tally, although
for completeness, the basis of his objection is included in the
Court's discussion <u>infra</u>.

[8]   The United States filed a "Statement of Interest," and the
Arizona Attorney General filed an amicus brief.  While neither the
United States, nor the individual States' Attorneys General are
class members-- and therefore they are not "objectors" in the
formal sense-- both filings were rather critical of the proposed
settlement, and their observations did somewhat overlap with
objections raised by class members.

receive more than $1.2 million if there is sufficient money

remaining in the newly created "Cash Fund," as described next.

(Id.)

Third, and most significantly, the Amended Settlement

Agreement provides for a $500,000 "Cash Fund" as an alternative to

Credits.  Specifically, the Amended Settlement Agreement provides,

> At the conclusion of the Redemption Period, WTSO will
> provide the Claims Administrator with an accounting of
> Class Members with unused Credits in excess of $2.00,
> and the Settlement Administrator shall mail checks to
> all such Class Members for their remaining balance, up
> to the total in the Cash Fund.

> If the total cash due Class Members exceeds the Cash
> Fund, then the monies will be distributed pro rata based
> on the amount of remaining Credits to the Class Members
> entitled to such cash payments[.]  If the cash payments
> are less than the Cash Fund, up to $35,000 in excess
> shall be returned to WTSO.  Any amounts over $35,000
> thereafter remaining in the [C]ash [F]und shall be
> available [as additional compensation to Class Counsel].

(Dkt No. 83-1, at p. 1-2 of 10)

Obviously, because the proposed modifications were in

response to objections from the proposed settlement class after

notice had been sent, the proposed settlement class as a whole has

not received notice of these changes.

### D.  <u>Final Approval Hearing</u>

On March 19, 2018, the Court held a final approval hearing.

The Court heard argument from both parties, the United States, the

States' Attorneys General, and several objectors.  The issues

explored during the hearing are discussed at length <u>infra</u>.  At the

conclusion of the hearing, the Court reserved decision and
directed the parties, and any objectors or other interested
parties who wished, to submit post-hearing letter briefs.

(1)  The Second Amended Settlement Agreement

After the final approval hearing, the parties made two
additional changes to the settlement which they assert provide
"even further benefit to the Class." (Dkt No. 97) First, the
Second Amended Settlement Agreement (Dkt No. 97-1), extends the
Verification Period from mid-April to May 15, 2018. Second, and
more significantly, the parties have changed the provisions
concerning attorney's fees and the Cash Fund. The settlement now
provides for the establishment of a $1.2 million "Balance Fund"
from which attorney's fees, if awarded by the Court, will be paid.
In the event that the Court awards fees in an amount less than the
total in the Balance Fund, the remainder will be "transferred"
from the Balance Fund into the Cash Fund to be distributed to
class members with unused Credits. Thus, in theory, the Cash Fund
could end up with a balance of $1.7 million, but that would only
occur if the Court awarded no attorney's fees.

The class has not received formal notice of these most recent
changes to the settlement either.

(2)  The Court's Order to Show Cause

After reviewing the post-hearing submissions, by an Order to
Show Cause dated March 29, 2018, the Court directed further

briefing on additional issues with respect to class certification. Thus, as of the date of this Opinion, the Court has received and thoroughly reviewed: the parties' joint brief in support of preliminary class certification / preliminary settlement approval; the objectors' submissions--including four legal briefs drafted by counsel, each brief exceeding 20 pages; the parties' joint brief in support of final class certification / final settlement approval; and post-final approval hearing submissions.

In addition to these written submissions, the Court has held two hearings spanning almost six hours. The Court has undertaken all of this in an attempt to ascertain all of the information necessary to decide whether to certify the proposed class and approve the proposed settlement. Unfortunately, despite this Court's best efforts to afford the parties ample opportunity to provide the Court with the information it requires, many fundamental and important questions remain unanswered.

## II.  LEGAL STANDARDS

### A.  Settlement Class Certification under Rule 23(a) and (b)(3)

A proposed class must meet the (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy requirements of Fed. R. Civ. P. 23(a). Additionally, in this case Plaintiffs must establish that "common" "questions of law or fact" "predominate over any" individual questions, and that "a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[B]efore approving a class settlement agreement, a district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met." Sullivan v. DB Investments, Inc., 667 F.3d 273, 296 (3d Cir. 2011) (en banc). "'Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial. But other specifications of [Rule 23]-- those designed to protect absentees by blocking unwarranted or overbroad class definitions-- demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.'" In re Pet Food Prod. Liab. Litig., 629 F.3d 333, 341 (3d Cir. 2010) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997)).

## B. Rule 23(e)

"The claims, issues or defenses of certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. . . . If the proposal would bind class members, the court may approve it only after a hearing and or finding that

it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

As the Manual for Complex Litigation, Fourth, § 21.62 explains,

> Fairness calls for a comparative analysis of the
> treatment of class members vis-à-vis each other and vis-
> à-vis similar individuals with similar claims who are
> not in the class. Reasonableness depends on an analysis
> of the class allegations and claims and the
> responsiveness of the settlement to those claims.
> Adequacy of the settlement involves a comparison of the
> relief granted relative to what class members might have
> obtained without using the class action process.

### C. The *Girsh* and *Prudential* Factors

"Rule 23(e) imposes on the trial judge the duty of protecting

absentees, which is executed by the court's assuring the

settlement represents adequate compensation for the release of the

class claims." In re Prudential Ins. Co. Am. Sales Practice

Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998) (internal

citation and quotation omitted). "[W]here the parties

simultaneously seek certification and settlement approval . . .

courts [must] be even more scrupulous than usual when they examine

the fairness of the proposed settlement. This heightened standard

is designed to ensure that class counsel has demonstrated

sustained advocacy throughout the course of the proceedings and

has protected the interests of all class members." Id. at 317

(internal citation and quotation omitted); see also, In re Baby

Prod. Antitrust Litig., 708 F.3d 163, 175 (3d Cir. 2013) ("Because

class actions are rife with potential conflicts of interest

between class counsel and class members . . . district judges

presiding over such actions are expected to give careful scrutiny to the terms of proposed settlement in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole.") (internal citation and quotation omitted).

In carefully scrutinizing the proposed settlement, the Court considers the familiar, nonexclusive <u>Girsh</u> and <u>Prudential</u> factors:

> (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

<u>Girsh v. Jepson</u>, 521 F.2d 153, 157 (3d Cir. 1975); and

> [1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-- or likely to be achieved-- for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

<u>Prudential</u>, 148 F.3d at 323.

**D.** **The Class Action Fairness Act, "CAFA," 28 U.S.C. § 1712**

"Coupon settlements" also require "judicial scrutiny" under CAFA, 28 U.S.C. § 1712(e). "In a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members." Id.

**III. ANALYSIS**

The parties seek simultaneous class certification and settlement approval. The Court addresses each in turn.

**A.** **Class Certification**

In light of the Court's disapproval of the settlement under Fed. R. Civ. P. 23(e), the Court does not decide whether or not the class may be certified. The issue, however, was raised by the Court in its Order to Show Cause dated March 29, 2018, and to the extent a brief discussion will inform the parties' decisions concerning how to proceed in light of the Court's disapproval of the settlement, the Court observes the following.

It appears that inherent factual differences among the proposed class members have existed from the beginning of this suit. At first, when this suit only involved the A and B wines-- each of which allegedly were the subject of two different fraudulent schemes-- the Court held, upon Wines 'Til Sold Out's Motion to Dismiss, that Plaintiffs' claims based upon the B wines

should be dismissed without prejudice because Plaintiffs had not alleged that they purchased any B wines. Thus, both the allegations of the Complaint, and the Court's disposition of the Motion to Dismiss reflected the factual differences within proposed class.

Thereafter, the parties reached a settlement, which only injected another difference into the case: the addition of the C wines into the proposed settlement class.[9] As set forth in the Court's Order to Show Cause, it was not clear to the Court that any named Plaintiff was alleged to have purchased any B or C wines, and therefore the Court questioned whether "Plaintiffs . . . who may have purchased only A wines, have claims that are typical of settlement class members who assert claims based on A, B, and C wines." (Dkt No. 102) Plaintiffs have answered the factual question of who purchased what wines insofar as Plaintiffs' counsel submits his own declaration stating that all three named Plaintiffs have purchased A and C wines, and Plaintiffs Lewis and Diane Lyons both purchased B wines as well.

---

[9] The significance of this change, and the questions attendant to it, cannot be overstated. The parties have not informed the Court how the addition of the C wines has affected the size and make-up of the class, although the Court may reasonably infer, based on the limited numbers of wines appearing on the A and B lists, that adding the C wines resulted in a material expansion of the class.

(Dkt No. 106-1, Giskan Decl. ¶¶ 4, 6)[10]  However, the Court's legal

question-- whether the Plaintiffs' claims are typical of the

class-- remains.  Plaintiffs agree with the Court as to the

applicable legal standard.  As correctly stated in Plaintiffs'

brief in response to the Order to Show Cause, "[f]actual

differences will not defeat typicality *if* the named plaintiffs'

claims arise from the same event or course of conduct that gives

rise to the claims of the class members and are based on the same

legal theory."  Danvers Motor Co. v. Ford Motor Co., 543 F.3d 141,

150 (3d Cir. 2008) (emphasis in original).  In Danvers, the Court

held the named plaintiffs' claims atypical because "Plaintiffs'

own allegations make clear that their claims, although ostensibly

all arising from the Blue Oval Program, are rooted in a variety of

actions Ford took pursuant to the BOP."  Id.  Plaintiffs make no

attempt to distinguish Danvers from this case, other than to

broadly assert that "[h]ere, Plaintiffs allege that the claims

_____

[10]  It is worth noting that counsel, rather than the
individual Plaintiffs themselves, submitted a declaration
concerning Plaintiffs' purchases.  This distinction is important
because the proposed settlement provides for a $2,500 incentive
award for each of the three plaintiffs, "up to a total of $10,000
for all Class Representatives" (Dkt. No. 43-1, p. 18 of 29), yet
it is not clear to the Court what each individual Plaintiff has
contributed to this litigation to support such a sizeable award.
See In re Flonase Antitrust Litig., 291 F.R.D. 93, 107 (E.D. Pa.
2013) (reducing incentive award to named plaintiffs because class
counsel "provide[d] no evidence that the representatives actually
played a substantial role in the litigation, aside from sitting
for depositions.").

arise out of the same conduct of the Defendant, namely, its sale of wines pursuant to a scheme which included misrepresentations of discounts on wine sold on WTSO.com." (Dkt No. 106, p. 12 of 30) Plaintiffs' position in this regard though, begs the question: if Plaintiffs' claims are all premised upon the same allegedly illegal conduct, why does the proposed settlement distinguish between A, B and C wines at all?

Moreover, as will be discussed further _infra_, the Complaint does not allege-- and more importantly, Plaintiffs confirmed at the final approval hearing that they have no factual basis to allege-- that Wines 'Til Sold Out made any misrepresentation as to any C wine. [11]  Thus, it appears that Plaintiffs have taken irreconcilably inconsistent positions.  Either the proposed class has allegedly suffered the same harm arising from the same course of conduct, in which case there would be no need to distinguish between the A, B, and C wines; or there is a need to distinguish between the A, B, and C wines (or at the very least, distinguish

_____

[11] At the final approval hearing Plaintiffs' counsel stated, "[as to] the list of C wines, we did not see anything which suggested that these wines should be on Exhibit B or Exhibit A. That doesn't mean we're saying no harm, no deception.  We've alleged a scheme in the complaint, the company was marketing their products deceptively, that's what we have alleged.  And because we didn't have anything specific to move a wine from C to B or C to A, we put them in their own group, gave people 20 cents for each bottle,[and] released their claims." (Transcript, p. 81); _see also_ Id., p. 107 ("We researched the non-imported wines that didn't make it to A and B, and we did not see the type of deception that we saw with A and B wines.").

the C wines for which no misrepresentation is alleged) because Wines 'Til Sold Out's alleged conduct is different as to each group.

Whether this issue is properly framed as a typicality, commonality, or predominance issue-- <u>Danvers</u> held all three requirements were not met-- it is an issue that may need to be resolved if, in the future, Plaintiffs once again seek certification of the same proposed class.

**B. Interaction of Rule 23(e), *Girsh / Prudential*, and CAFA**

Before turning to the Court's discussion of the proposed settlement, a brief analysis of the applicable law is necessary. Two questions are presented. First, does CAFA apply; is the proposed settlement a "coupon settlement"? Second, if CAFA applies, what type of scrutiny does the statute require; does CAFA require a level of scrutiny higher than that of Fed. R. Civ. P. 23(e)? Because the Court holds that the proposed settlement should not be approved even if it were not subject to CAFA scrutiny-- in other words, if the proposed settlement were only subject to Fed. R. Civ. P. 23(e) review, the Court would not approve it-- the Court need not decide either question. Nonetheless, the considerations raised in the CAFA coupon settlement context do inform the Court's examination of the nonexclusive <u>Girsh</u> and <u>Prudential</u> factors as applied to this

24

proposed settlement.  In this regard, some discussion of CAFA is helpful to an understanding of this Court's decision.

As to the first question, the parties have not taken a clear position on whether the Credits offered under the proposed settlement are "coupons" under CAFA.  While Plaintiffs assert in their brief that the proposed settlement "is not a coupon settlement subject to . . . CAFA" (Dkt No. 88, p. 13 of 68), at the final approval hearing, Plaintiffs' counsel stated that "we are not running away from the requirements for coupon settlements." (Transcript, p. 47)  Moreover, Defendants' brief appears to assume CAFA applies without discussing the issue. (Dkt No. 84, p. 9 of 18)[12]

It would appear that the Credits are "coupons" under CAFA insofar as they provide a discount for goods that only Wines 'Til Sold Out sells.  Cf. In re Sw. Airlines Voucher Litig., 799 F.3d 701, 706 (7th Cir. 2015) ("We have rejected a narrow definition of "coupon" by rejecting, for purposes of § 1712, a proposed distinction between "vouchers" (good for an entire product) and "coupons" (good for price discounts)."); see also, In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 950–51 (9th Cir. 2015) (observing that CAFA's legislative history "focuses on settlements

_____

[12]  Additionally, the United States, the States' Attorneys General, and several objectors assert that the Credits are coupons under CAFA.

that involve a discount-- frequently a small one-- on class members' purchases from the settling defendant."). Contrary to Plaintiffs' argument, the fact that *some* Credits are stackable (Transcript, p. 47)[13] likely renders them better coupons under CAFA-- i.e., more likely to provide some amount of actual value to class members[14]-- rather than not coupons at all.

Similarly, the fact that the Amended Settlement Agreement now includes a cash option may not remove the settlement from CAFA's jurisdiction. As discussed further infra, the Court has concerns that the Cash Fund is insufficiently funded to adequately compensate the class if a significant number of class members choose the cash option. That is to say, the parties have not assuaged the Court's concern that, due to the danger of potentially receiving no cash / very little cash once pro rata distributions from the Cash Fund are made, class members might conclude they have no meaningful choice but to opt for Credits in the hope of receiving something now, rather than waiting merely to

---

[13] It is important to note that under the both the Original Settlement Agreement and the Amended Settlement Agreement, not all Credits are stackable. The proposed settlement provides that for every A wine bought for $13.00 to $18.99, a class member gets a $2.00 Credit, and for every A wine bought for $19.00 or more, a class member gets a $2.25 Credit. Because the Agreements limit stacking to $2.00, all Credits for A wines exceeding $12.99 are not stackable.

[14] Although, as discussed infra, as the case presently stands the Court cannot quantify what that value is.

find that they receive nothing / close to nothing later. Where, as here, the terms of the settlement effectively place a thumb on the scales in favor of selecting the Credit option[15], the Court would hold, if it were necessary, that CAFA applies.

As to the second question, as Defendants correctly observe, Rule 23(e) and CAFA employ identical language. Under both, the Court must determine that the proposed settlement is "fair, reasonable, and adequate." Despite this identical language however, the weight of authority suggests that Congress intended for courts to apply heightened scrutiny to coupon settlements. See 4 Newberg on Class Actions § 12.12 (5th ed. 2017) ("Notwithstanding CAFA's virtual restatement of existing law, courts across a number of circuits have held that [CAFA] requires heightened judicial scrutiny of coupon-based class action settlements.") (collecting cases).

Nonetheless, in this Court's view, the answer to both questions may be largely academic in this case. In the Third Circuit, the district court may consider all relevant factors

_____

[15] It is clear that the parties view the Cash Fund as a back-up to the Credits option. In their post-hearing submission, the parties explain, "[i]n essence, the failsafe Cash Fund serves to ensure that even unused Credits still provide value to Class Members who submitted a Verification Form. Class Members will thus not be required to make a single decision between Credits or cash; rather Class Members will automatically participate in the failsafe Cash Fund if they do not redeem their Credits." (Dkt No. 97, p. 4 of 6)

guided by the nonexclusive _Girsh_ and _Prudential_ factors, and must

apply heightened scrutiny to all proposed class action

settlements-- coupon or not-- where the parties simultaneously

seek certification and settlement approval.  Thus, even if this

proposed settlement is not a "coupon settlement" under CAFA, it

has some characteristics of a CAFA coupon settlement, and the

Court believes it can, and should, to the extent relevant, consult

the authority applying CAFA.  Accordingly, along with the _Girsh_

and _Prudential_ factors, the Court also carefully considers, but

does not give dispositive weight to, the factors relevant to

evaluating coupon settlements under CAFA.  Those factors include

"whether the proposed coupons are transferable; have a secondary

market in which they can be discounted and converted to cash;

compare favorably with bargains generally available to a frugal

shopper; and are likely to be redeemed by class members."  Federal

Judicial Center, Managing Class Action Litigation: A Pocket Guide

for Judges (3d ed., 2010), p. 18.

       As with all proposed class action settlements, the ultimate

issue is whether "the settlement represents adequate compensation

for the release of the class claims."  _Prudential_, 148 F.3d at

316.[16]

---

[16]  _See_ _also_ 4 Newberg on Class Actions § 12.13 ("Courts have
struggled to define coupons [under CAFA], but the outcome of that
struggle is somewhat inconsequential in that most courts will
carefully scrutinize a settlement that proposes to trade the

## C.  **Class Members' Objections and Other Submissions**

The Court discusses the objections and other submissions in order of appearance on the docket.

### (1)  Keith Brown

Brown objected on the basis that he lives in Texas where wine cannot be shipped to him.  He later withdrew his objection, stating that class counsel directed him to the information concerning the cash provision for no-ship class members, with which Brown states he is satisfied.

### (2)  Kendall Cox

Cox also objects on the basis that wine cannot be shipped to her or his state.

### (3)  William James

---

class's claims for any nonpecuniary relief.  In undertaking that close look, courts will attempt, often through expert testimony, to put a dollar value on the nonpecuniary relief.") (emphasis in original); 2003 Advisory Committee Notes, Fed. R. Civ. P. 23(h) ("Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class."); cf. In re Baby Prod., 708 F.3d at 173 ("We caution . . . that direct distributions to the class are preferred over cy pres distributions.  The private causes of action aggregated in this class action-- as in many others-- were created by Congress to allow plaintiffs to recover compensatory damages for their injuries.  Cy pres distributions imperfectly serve that purpose by substituting for that direct compensation an indirect benefit that is at best attenuated and at worse illusory.") (internal citations omitted).

James objects, observing that "[t]he 'credits' being offered have to be applied as a small discount on each new bottle of wine purchased, not as a credit against total purchases." (Dkt No. 49)

(4) <u>Steven Mayer</u>

Mayer writes, "WTSO always delivered the wines I wanted at the prices they advertised, which I believed to be fair. . . . I hope that the court determines that no damage was done and no settlement is required." (Dkt No. 50)

(5) <u>Mari Stull</u>

Similarly, Stull objects on the basis that the claims asserted in the Complaint "are frivolous and baseless." (Dkt No. 52) Stull states that the prices she paid for WTSO wines were "extraordinary values and discounts that [she] could not source from anywhere else." (Id.)

Stull also urges the Court, "at a very minimum," to deny Class Counsel's requests for attorneys' fees and expenses." (Id.)

(6) <u>Derek Hansen, Vytauras Sasnauskas, and Ryan Russell</u>

Hansen, Sasnauskas and Russell are collectively referred to as "the Ohio objectors," as they all reside in Ohio. They have retained counsel who filed a brief in support of their objections. The Ohio objectors assert four main objections to the terms of the proposed settlement, as those terms stood at the time notice was

sent to the class.[17]  First, they argue that the proposed

settlement does not "immediately convey a direct benefit to the

Class" because there is no option for the class members to convert

their Credit to cash unless they are a no-ship class member.  (Dkt

No. 55, p. 10 of 21)

Second, they assert that "any unused portion of the

settlement amount will revert back to Defendants" rather than

being distributed to the class.  (Dkt No. 55, p. 12 of 21)

Third, they object that the proposed class counsel fee is

unreasonable because "the actual benefit to the class is not

determinable until credits are redeemed."  (Dkt No. 55, p. 15 of

21)  They assert that the reasonableness of Class Counsel's fee

should not be measured against the face value of the coupons.

Lastly, the Ohio objectors assert that the proposed

nationwide settlement class cannot be certified until differences

in state law have been properly analyzed.

At the final approval hearing, counsel for the Ohio objectors

also expressed concern over the Verification Form process, as well

as the possibility that certain class members may have to increase

their purchasing frequency to fully benefit from the settlement,

and reiterated the objectors' concern about a partial reversion of

settlement funds.

---

[17]  As discussed, the parties have since proposed material
changes in response to these, as well as other, objections.

In their post-hearing brief, the Ohio objectors[18] assert that problems remain with respect to the C wines, the Cash Fund, the Verification process, lack of class notice with respect to the proposed changes to the settlement, and a potentially low redemption rate.

In particular, with respect to the C wines, the Ohio objectors assert:

> [a]t the Fairness Hearing, issues surrounding the "C Wines"-- or the wines not listed in Exhibits A or B to the Revised Settlement Agreement-- were discussed at length. Plaintiffs' counsel indicated that they had done their own research and found that Defendants had properly offered and advertised these C Wines. It is unclear how exactly Plaintiffs' counsel made that critical, individualized determination for, in the words of defense counsel, "hundreds of thousands" of wines. Even defense counsel indicated they had not produced any records related to the market price of the C Wines. This also begs the question whether Plaintiffs' claims are typical of the class where there is no evidence that they purchased C Wines and the vast majority of Class Members' purchases fall within the C Wines category. Fed Civ. R. 23(a)(3). Class counsel consistently explained that purchasers of Exhibit C wines were included for the purpose of securing a full release for the Defendants. But class members' claims cannot be released on such a justification. Such releases are only fair, adequate, and reasonable if the court can confidently determine the value of the claims in comparison to the relief offered.

(Dkt No. 96, p. 2 of 8)

---

[18]  Objector Edward Tahir Duckett joined the Ohio objectors' post-hearing brief.

With respect to the Cash Fund, the Ohio objectors propose that the fund should be "at least the amount of claimed [C]redits at the end of the Verification process which, so far, is $2,994,907.95." (Dkt No. 96, p. 4 of 8) Significantly increasing the Cash Fund, the Ohio objectors assert, "will ensure that any Class Member who elects not to utilize their credits will still get equal cash value at the end of the Redemption Period." (Id.)

(7) <u>Ryan Radia</u>

Radia has also retained counsel who filed a brief in support of Radia's objection. Radia's objection mainly focuses on the proposed fee award.[19] Similar to the Ohio objectors, Radia argues that any percentage-based fee award should be based on the actual value conferred on class members.

At the final approval hearing Radia's counsel observed,

> there's a lot of uncertainty around this settlement. We don't know what the actual redemption rate is going to be, we don't know what the class' response is going to be to this new cash option of which they have yet to be informed, and we don't know how the economic value is going to be allocated as between the class and class counsel.

(Transcript, p. 82)[20]

_____

[19]   Radia also suggests that named plaintiffs Kyle Cannon and Lewis Lyons have conflicts of interest which render them inadequate class representatives. The Court explored this issue with counsel at the final approval hearing, but in light of the Court's ruling on the other issues presented, the Court does not reach the issue.

[20] Radia elected not to file a post-hearing submission.

(8)  Patrick Dean Taylor

Taylor's objection has three bases.  First, Taylor asserts
that he will have to increase his wine purchasing habits in order
to fully use his Credits within the Redemption Period.  Second, he
argues that the proposed attorney's fee award is based on an
inflated value of the settlement because it assumes a very high
redemption rate.  Third, he asserts that the settlement terms do
not "appreciably punish WTSO for their [alleged] behavior."  (Dkt
No. 60)

(9)  United States' Statement of Interest

The United States initially "urge[d] the Court to reject the
proposed class action settlement," (Dkt No. 58, p. 5 of 23) as it
was noticed to the class asserting (1) "[t]he proposed settlement
provides an unreasonable payout to class counsel for pursuing
claims lacking a basis in consumer harm"; and (2) "[e]ven if
consumers were harmed, limited-value coupons do not fairly,
reasonably and adequately compensate consumer claimants."  (Id. at
p. 2 of 23)

Similarly, at the final approval hearing, after reviewing the
parties' proposed amendments to the proposed settlement, the
United States acknowledged that the proposed amendments were
improvements to the settlement but stated that it "still ha[d] a
few areas of concern with the proposed settlement."  (Transcript,
p. 92)  Namely, the United States questioned whether the proposed

Credits provided sufficient value to the class, expressed concern that the Verification Form created an unnecessary obstacle to the claiming (and by necessary extension, redemption) of Credits, and also expressed concern that the proposed amendments might not adequately ensure the proportionality of Class Counsel's fee award in relation to the actual redemption rate of the Credits.

In post-hearing briefing however, the United States did an about-face and now, without any helpful explanation (indeed, none at all), takes the position that "the revisions are sufficient to allow the Court to approve the amended proposed settlement as fair, adequate, and reasonable." (Dkt No. 98)

(10) States' Attorneys General

The Arizona Attorney General, joined by 18 other States' Attorneys General, urged the Court to reject the proposed settlement as noticed because, they assert, the Credits are of limited value to class members due to various restrictions placed on their use, including non-transferability, limited stackability, a limited Redemption Period, and the requirement that class members complete a Verification Form before obtaining their Credits.

At the final approval hearing, the Attorneys General, like the United States, acknowledged that the newly proposed amendments-- particularly the addition of a cash option-- were a step in the right direction. However, they also expressed

"primary concern" that the amount of the Cash Fund, $500,000.00, is not "large enough to have a reasonable expectation that people would actually get cash out of it." (Transcript, p. 57)[21]

(11) Edward Tahir Duckett

Like other objectors, Duckett challenges the Verification Form as an unnecessary obstacle to class members claiming their compensation under the settlement, and also asserts that "[t]he proposed settlement offers widely varying amounts of relief for class members, depending on whether they purchased wines listed on Exhibit A, Exhibit B, or wines listed on neither Exhibit. Nowhere do the parties offer a justification for these varying amounts of relief." (Dkt No. 86, p. 3 of 20)[22] Notably, Duckett asserts that he purchased 66 bottles of wine from WTSO during the class period and none appear to be A or B wines.

At the final approval hearing, Duckett also acknowledged that the parties' proposed changes to the proposed settlement were an "improvement," but he maintains that the newly amended proposed settlement is still unfair, in part because of the persisting questions with respect to the C wines. Duckett asserted, "Defense counsel's desire for a full release does not justify arbitrarily

---

[21] The States' Attorneys General elected not to file a post-hearing submission.

[22] Duckett has appeared *pro se* as an objecting putative class member.

giving C list wines one-tenth of the relief of other wines. . . .
[W]e really just don't know whether or not the people who
purchased Exhibit C wines have strong claims or not.  There is not
enough clear from [Class Counsel's] declaration in terms of what
the methodology of the research was, that differentiates the
Exhibit B wines from the Exhibit C wines."  (Transcript, p. 99-
100)

Lastly, Duckett also asserted at the hearing that "the cash
fund is not proportionate to the coupon fund.  The coupons at
their greatest value are worth over 10 million [dollars] and the
cash value -- the cash fund is worth under 5 percent of that."
(Id. at p. 102)

**D.  The Court's Heightened Scrutiny Analysis of the Settlement**

The Court must compare: (1) the strength of the putative
class' claims with (2) the value of what class members will
receive in exchange for release of those claims.  At this stage of
the case, the Court cannot adequately quantify either side of this
equation.[23]

_____

[23] See Galloway v. Kansas City Landsmen, LLC, 2013 WL
3336636, at *4 (W.D. Mo. July 2, 2013) (denying coupon settlement
approval, explaining "[t]he Court, however, remains concerned that
the Amended Settlement offers insufficient value for the class
members' claims.  Specifically, the Court cannot determine from
the existing record (1) an approximate value for the class
members' claims, and (2) the approximate value of the Amended
Settlement.  Without this information, the Court has no rational,
independent basis for deciding whether the Amended Settlement is
fair, reasonable, and adequate."); Sobel v. Hertz Corp., 2011 WL

(1)  <u>Strength of Plaintiffs' Claims / Alleged Harm to Class</u>

As set forth above, at least two objectors, the United States, and, of course, Wines 'Til Sold Out, have suggested that no class member has suffered any harm.  As succinctly stated by the United States in its Statement of Interest, "[t]he parties agree that claimants actually received the products they ordered at the prices to which they agreed.  Whatever 'original price' was advertised, the actual price is what customers willingly paid." (Dkt No. 58, p. 5 of 23)  Indeed, the Court's opinion on Wines 'Til Sold Out's Motion to Dismiss recognized this potential weakness in Plaintiffs' claims, yet in recognition of the early stage of the proceedings the Court stated, "[d]iscovery will elucidate the amount of the Plaintiffs' alleged ascertainable loss, if any.  Accordingly, the Court finds that, by a slim margin, Plaintiffs have adequately pled ascertainable loss and damages for purposes of the NJCFA and fraud claims."  <u>Cannon v. Ashburn Corp.</u>, 2016 WL 7130913, at *8 (D.N.J. Dec. 7, 2016).[24]

_____

2559565 at *6 (D. Nev. June 27, 2011) ("before granting final approval, the court must discern if the value of a specific coupon settlement is reasonable in relation to the value of the claims surrendered.").

[24]  Plaintiffs correctly state that they are "not required to _prove_" "harm or loss to consumers" in the settlement approval context.  (Dkt No. 88, p. 15 of 68) (emphasis added)  They are expected, however, to discuss the relative strength of their case and how it compares to the relief obtained by the settlement.
Similarly, Plaintiffs criticize the Objectors for "fail[ing] to set forth a valuation of the Claims of the Class that would

Importantly, the Court's Opinion on the Motion to Dismiss marks the end-point in the parties' adversarial litigation of this case. While the parties represent that they engaged in limited, informal "confirmatory" discovery after the Court's Opinion, it was done in furtherance of settlement rather than any attempt to test the true merits of the claims.[25] Thus, the parties have very little to offer in terms of evidence to enable the Court to weigh the strength of Plaintiffs' claims based on the A and B wines. See Galloway, 2013 WL 3336636 at *4-5 ("Although the district court cannot value the claims with a high degree of precision, the court should insist that the parties present evidence that would at least enable it to make a ballpark valuation before deciding whether to approve a settlement. . . . The Plaintiff should place in the record an estimate of the class members' claims so that the Court can demonstrate it has a rational basis to approve the Amended Settlement, particularly since Plaintiff proposes to

---

support a finding that the relief provided in the settlement is unfair." (Dkt No. 88, p. 15 to 68) This argument erroneously, and frankly, unfairly, shifts the burden to the Objectors. The proponents of the settlement bear the burden of demonstrating that the settlement is fair, reasonable and adequate. Sullivan v. DB Investments, Inc., 667 F.3d 273, 320 (3d Cir. 2011).

[25] Plaintiffs unequivocally state in their brief, "from the start of the [pre-suit case] investigation until entry into this [Settlement] Agreement, Class Counsel obtained no discovery from WTSO." (Dkt No. 88, p. 17 of 68)

settle the class members' claims so early in the litigation.")
(internal citations and quotations omitted).

Moreover, an even greater dearth of information exists as to the C wines. The Complaint does not, and never did, include an allegation that a consumer who only purchased C wines was subject to either alleged fraudulent scheme in the Complaint.[26] Thus, the C wines were never even the subject of a Motion to Dismiss. Indeed, at oral argument the Court questioned, and it continues to question, whether claims based solely on C wine purchases could be pled in good faith given Plaintiff's concession at the final approval hearing that "we didn't have anything specific to move a wine from C to B or C to A," and that "we did not see the type of deception that we saw with A and B wines." (Transcript, p. 81, 107) Indeed, as some objectors have noted, it was not even apparent that Defendants committed any wrongdoing.

---

[26] In their post-hearing submission, Plaintiffs anemically attempt to read into the Complaint the C wines relying on paragraph 4 of the Complaint which states "Defendants' deception includes, but is not limited to, alternating between legitimate offers-- with accurate representations-- and fabricated and misleading offers, all in an effort to conceal Defendants' fraudulent and misleading practices." Plaintiffs, however, cannot escape the fact that the Complaint's class definition does not include C wines. The class is defined as "[a]ll persons who purchased from Defendants wines which were advertised for sale on the WTSO.com website with a fictional, fabricated or inflated 'Original Price'." (Compl. ¶ 45).

Stated in terms of the _Girsh_ / _Prudential_ factors, the early stage of the proceedings and the very small amount of discovery completed (_Girsh_ factor 3[27]), as well as the immaturity of the substantive merits issues (_Prudential_ factor 1) all weigh against settlement approval. The settlement of this case shortly after the disposition of Wines 'Til Sold Out's Motion to Dismiss has effectively prevented the development of the information necessary to assess the strength of Plaintiffs' claims in this regard.[28]

Further, as discussed _supra_, the introduction of the C wines into this case also increases the risk of failing to obtain class

---

[27] The third _Girsh_ factor "captures the degree of case development that class counsel had accomplished prior to the settlement," so that the Court may "determine whether counsel had an adequate appreciation of the merits of the case before negotiating." _In re Warfarin Sodium Antitrust Litig._, 391 F.3d 516, 537 (3d Cir. 2004) (finding the third _Girsh_ factor established where the record reflected "three years of litigation and discovery result[ing] in hundreds of thousands of documents produced by defendant, numerous depositions, and consultations with experts."). The Court cannot determine whether counsel had an adequate appreciation of the merits of the case before negotiating the settlement.

[28] Relying in part on Wines 'Til Sold Out's asserted inability to (a) afford protracted, complex litigation (_Girsh_ factor 2) and (b) withstand a greater a greater judgment (_Girsh_ factor 7), the parties assert that early resolution of this dispute is desirable. However, the Court has no information from Wines 'Til Sold Out concerning its actual financial condition. Plaintiffs assert that "while [WTSO] is profitable, it is unlikely that WTSO could withstand a judgment for considerably more than . . . $3 million . . . and certainly not more than . . . $10 million." (Dkt No. 85, p. 32-33 of 68) Plaintiffs cite no evidence in support of this statement.

certification (<u>Girsh</u> factor 6).  The parties have not answered to the Court's satisfaction why the C wines have been included in the proposed settlement class.  Indeed, when the Court asked why the C wines were included in the proposed settlement, Plaintiffs' counsel stated, "[w]e did our investigation, we determined that it wouldn't be the subject of the complaint, but if the defendant wanted a release from that, they should pay something." (Transcript, p. 38)  This answer is not only inadequate, but unsettling to the Court.  <u>See</u> Manual for Complex Litigation, Fourth § 21.62 ("Frequently, the parties propose to enlarge the class or the claims of the class to give the settling defendants greater protection against future litigation.  [Any] court faced with a request for an expanded class definition should require the parties to explain in detail what new facts, changed circumstances, or earlier errors support the alteration of the original definition.").  Without such explanation, the Court is deprived of the opportunity to probe the reason for doing so: do the lawyers win, and the class loses, or not?[29]

_____

[29]  As Professor Erichson has observed, in the settlement context, as opposed to active litigation, incentives change:

> A defendant's preference for a narrow or broad class definition depends on whether the class action is being defined for purposes of litigation or settlement.  When class actions are to be litigated, defendants generally prefer narrower class definitions.  The bigger the class, the bigger the exposure.  In settlement, however, defendants prefer the broadest class definition they can

Accordingly, the Court cannot determine the strength of Plaintiffs' claims.

(2)  Value of the Settlement-- Value of (a) Credits; (b) Cash Fund; and (c) Injunctive Relief

For the reasons explained next, the Court cannot ascribe any concrete, quantifiable value to either the Credits or the

---

obtain for a reasonable price.  The defendant, after all, is paying for res judicata.  When a court enters judgment approving a class settlement, every class member is precluded from pursuing the claim against the defendant.  The more claim preclusion the defendant can get for its settlement dollars, the happier the defendant.

When it comes to defining a settlement class expansively, class counsel have no incentive to resist a defendant's preference.  Class counsel prefer to define a class as broadly as possible within the constraints of class certification. The bigger the class, the bigger the franchise.  Class action lawyers lose nothing by agreeing to "represent" a larger pool of claimants in the settlement.  If the prospect of expansive preclusion lubricates the deal, then acceding to a broader class definition enriches class lawyers by hastening the settlement, sweetening the fees, or both. Thus, defendants and class counsel sometimes expand their class definitions when negotiating settlement class actions.  The losers are the claimants swept in by the expanded class definition whose claims are thereby released, but who get little or nothing of value from the deal.

Howard M. Erichson, Aggregation As Disempowerment: Red Flags in Class Action Settlements, 92 Notre Dame L. Rev. 859, 895 (2016).

injective relief, and the Court has no evidence from which to conclude that the $500,000.00 Cash Fund is fair and adequate.[30]

(a) Value of the Credits

In determining the value of the Credits, the Court examines several factors including: the projected redemption rate of the Credits; the effect of the stacking limit on the value of the Credits; the effect of the non-transferability of Credits; the class members' demonstrated interest in using the Credits; and reversion to Wines 'Til Sold Out of the unused Credits.

*Projected Redemption Rate*

Determining the precise value to the class of the rare beneficial coupon settlement requires hard data on class members' redemption of the coupons. See Sobel, 2011 WL 2559565 at *11 ("Because redemption rates have a direct and potentially devastating impact on the actual value received by the class, such lack of evidence prevents any reasoned assessment of the settlement's actual value to the class.").[31] Of course, in this case there is no such data because the class members have not yet

---

[30] For this reason, the Court cannot determine Girsh factors 8 and 9 which both focus on the reasonableness of the settlement fund.

[31] See generally, CAFA, 28 U.S.C. § 1712(d) ("In a class action involving the awarding of coupons, the court may in its discretion upon the motion of a party, receive expert testimony from a witness qualified to provide the actual value to the class members of the coupons that are redeemed.").

had an opportunity to use their Credits.  Accordingly, the parties

point to the claims rate--  the number of completed Verification

Forms submitted-- of "approximately 14%," amounting to

approximately $3 million in value[32], as a proxy for the redemption

rate. (Dkt No. 84, p. 16 of 18; Dkt No. 88 p. 52 of 68; Dkt No.

84, p. 16 of 18)  However, claims rate does not equal redemption

rate, and there are good reasons to expect that the redemption

rate in this case will be significantly lower than the claims

rate.

First, class members do not know how many Credits they will

receive until they submit the Verification Form.  If a class

member submits the Verification Form only to find out that he or

she gets a total of twenty cents of Credit, perhaps the class

member will decide that actually redeeming the Credit is not worth

the effort.  See Sobel, 2011 WL 2559565 at *11 ("redemption rates

can vary widely and may be particularly low in cases involving

low-value coupons.").[33]  In this regard, submission of a

---

[32]  See Arking Aff. ¶ 10 (Dkt No. 84-1) ("According to WTSO
records, as of March 6, 2018 . . . 34,273 known Class Members
submitted Verification Forms.  WTSO calculated that the total
amount of Credits to be distributed to those Class Members is
$2,994,907.95").

[33]  Cf. In re Baby Prod., 708 F.3d at 176 ("we doubt that this
is the type of small claims case where the potential awards were
necessarily insufficient to motivate class members to file claims.
We think it more likely that many class members did not submit
claims because they lacked the documentary proof necessary to

Verification Form does not necessarily reflect an intent to redeem settlement Credits, but may be simply an inquiry as to how much Credit is available to an individual class member.[34]  This possibility weakens the link between the claims rate and the projected redemption rate.

Second, for some class members-- importantly, it is not clear *how many* members because the parties have not provided specific numbers to the Court-- redemption will require more than one use of class members' individualized codes over the 18-month Redemption Period due to the $2.00 stacking limit on the Credits. It is reasonable to expect that as time goes by, the likelihood of full redemption through repeated use of the redemption code will decrease.  This likelihood further decreases the Court's confidence that the redemption rate will be roughly equal to the claims rate.

Thus, while the Court requires concrete numbers on a projected redemption rate, the record before the Court merely supports a conclusion that the redemption rate likely will be

_____

receive the higher awards contemplated, and the $5 award they could receive left them apathetic.").

[34]  The Ohio Objectors observe, "[i]t is one thing to fill out [a] verification form just to confirm your email address and any 'refunds,' and another to actually shop for wines and use [the credits] on the . . . wines [eligible for credit use]."  (Dkt No. 92, p. 3 of 7)

something less than 14%.  *How much less*, however, the parties do not venture to predict[35], much less present evidence of.

Indeed, the parties' papers in support of the proposed settlement are largely devoid of any numbers that would answer key questions such as: How many class members have purchased exclusively A wines, B wines, or C wines?  How many class members have purchased various combinations of wines-- either A, B and C; A and C; A and B; or B and C?  What is the mean, median and/or modal amount of Credits that the 243,710 class members should expect to receive under the proposed settlement?[36]  And perhaps most basically, what is the maximum amount of Credit a single class member will receive under the proposed settlement?  And what is the minimum?[37]  Without answers to these questions, the Court cannot ascribe any reliable value to the proposed settlement.  <u>See</u>

---

[35]  See Wines 'Till Sold Out's brief, Dkt No. 84, p. 14 of 18 ("WTSO cannot predict the usage rate for thousands of its customers, which vary over time for many reasons.").

[36]  Wines 'Til Sold Out states that "as of March 6, 2018, the majority of Class Members *having completed Verification Forms* will receive less than $36.00 in Credits."  (Arking Aff. ¶ 11, Dkt No. 84-1) (emphasis added).  This statement provides very little information as to the class as a whole; it effectively says at least 51% of 14% of the class members will receive less than $36.00.

[37]  The parties have not even calculated the number of no-ship class members, a number which presumably is rather easy to determine.  <u>See</u> Transcript, p. 23 ("THE COURT: So how many class members would come into the category of not being able to receive shipments?  [DEFENSE COUNSEL]: Well, it's hard for us -- we haven't calculated it.").

<u>Sobel</u>, 2011 WL 2559565 at *11 (disapproving final approval of class action settlement, in part because "[n]o figures have been provided, however, as to the breakdown of registrants entitled to $10 or $20 coupons, despite the likely availability of such figures from the claims administrators and the necessity of such figures for estimating the total face value of all coupons to be distributed."); <u>see</u> <u>generally</u>, <u>In re Baby Prod.</u>, 708 F.3d at 175 ("We vacate the District Court's orders approving the settlement and the fund allocation plan because it did not have the factual basis necessary to determine whether the settlement was fair to the class. Most importantly, it did not know the amount of compensation that will be distributed directly to the class.").

*Stacking Limit*

The parties also have not adequately addressed the concern, primarily raised by Objector Taylor and the Ohio Objectors, that the $2.00 stacking limit will effectively force class members to increase their purchasing frequency in order to exhaust their Credits within the Redemption Period. Even without specific numbers concerning individual class members' purchasing patterns (another piece of information the parties have not supplied to the Court), a simple comparison of the six-year class period with the 18-month Redemption Period suggests that the objectors' concerns may be well-founded. That is, the proposed settlement provides that class members will have only 18 months to spend Credits that

accrued over a six-year period of time.  If there were no limit on
stacking Credits, this disparity would be less concerning.  But
with the stacking limit, it does appear, based on the information
that various objectors have provided to the Court, that certain
class members might have to substantially increase their
purchasing frequency.

The Court has prepared the following chart based on the
bottle purchasing histories provided by Objectors Cox and Mayer[38]
to illustrate this point:

| OBJECTOR | BOTTLES PURCHASED PER YEAR DURING CLASS PERIOD | CREDITS TO BE USED WITHIN REDEMPTION PERIOD assuming minimum Credit of $0.20 / bottle | CREDITS TO BE USED WITHIN REDEMPTION PERIOD assuming maximum Credit of $2.25 / bottle |
|---|---|---|---|
| Cox | 2016 = 14 bottles<br>2015 = 34 bottles<br>2014 = 12 bottles<br>2013 = 8 bottles<br>2012 = 14 bottles<br>2011 = 38 bottles<br>2010 = 32 bottles<br><br>TOTAL= 152 bottles purchased during class period | 152 times $0.20 =<br><br>$30.40 divided by $2 =<br><br>16 bottles in 18 months | 152 times $2.25 =<br><br>$342.00 divided by $2 =<br><br>171 bottles in 18 months |
| Mayer | 2016 = 40 bottles<br>2015 = 23 bottles<br>2014 = 71 bottles<br>2013 = 70 bottles | 250 times $0.20 = | 250 times $2.25 = |

___

[38]  The Court's chart is employed for illustrative purposes
only.  Notably, the parties provided no such analysis to the
Court.  Wines 'Til Sold Out has not provided complete annual
purchasing histories for any of the Objectors.  In an Affidavit,
Joseph Arking states that "[a]ccording to WTSO's records, . . .
Steven Mayer . . . purchased one or more of the wines listed on
Exhibit A to the Settlement Agreement."  (Dkt No. 84-1 ¶ 6)  The
fact that Mayer purchased one A wine during the six-year class
period tells the Court very little about his purchasing pattern.
Moreover, the Arking Affidavit provides no information concerning
Objector Cox.

| | 2012 = 46 bottles<br>2011 = ?<br>2010 = ?<br><br>TOTAL= at least 250<br>bottles during<br>class period | $50.00 divided<br>by $2 =<br><br><u>25 bottles in</u><br><u>18 months</u> | $812.50 divided<br>by $2 =<br><br><u>407 bottles in</u><br><u>18 months</u> |
|---|---|---|---|

The clearest problem occurs in the right-hand column. If Cox and Mayer both purchased exclusively wines for which the maximum amount of Credits may be awarded (<u>i.e.</u>, A wines costing $19.00 or more) both would be required to purchase many more bottles of wine within an 18-month period than they ever have before: 171 and 407 bottles respectively, compared to a maximum historical annual purchase of 38 and 71 bottles respectively. But even assuming the minimum amount of Credits that could possibly be awarded (<u>i.e.</u>, Cox and Mayer each purchased exclusively C wines), a problem may still exist: Cox may be required to purchase 16 bottles in 18 months, which still exceeds the rate at which he purchased wine in 2013 (8 bottles in one year).

More to the point, however, is that the chart illustrates what the Court does not know. The parties have not provided even reasonable estimates to satisfy the Court that the hypothetical situation illustrated in the right-hand column of the table-- i.e., the worst-case scenario-- will not be an actual, typical problem for a significant number of class members, particularly when the parties assert that "*[m]any* Class members will receive

hundreds of dollars in Credits." (Dkt No. 88, p. 49 of 68) (emphasis added). Plaintiffs' discussion of this issue at the final approval hearing underscores the Court's point in this regard:

> MR. GISKAN: . . . This is a [sic] valuable relief for this class. And I think that even *if* there is someone out there who purchased a lot of Exhibit A wines and has -- will get a lot of credits per bottle that they purchased. They'll have 18 months to redeem. And *if* that's not enough, they're going to get *some* cash back.[39] *But that person is really hypothetical.*
>
> . . . .
>
> THE COURT: Where is the analysis that tells me how many A wines there are and how many they would have to buy to take full advantage of the settlement?
>
> MR. GISKAN: How many bottles of A wines and how many credits are attributable to the A wines?
>
> THE COURT: Is there an analysis that tells me how many class members would come under the A category, what their purchasing history is, and that to take full advantage of the settlement, their purchasing history of those A wines would not really vary much. Where is that analysis?
>
> MR. GISKAN: We don't have that information. We didn't present it.

(Transcript, p. 27-28, 31-32) (emphasis added).[40]

---

[39] As discussed <u>infra</u>, the Court does not agree with the parties' assertion that the "cash out mechanism . . . moots any concern" as to the limits on stackability and redemption time. (Dkt No. 84, p. 14 of 18)

[40] Later in the hearing, counsel invited the Court to infer from the low number of objections and opt-outs (see generally <u>Prudential</u> factor 4) that this potential problem with the stacking limit is not an actual problem; if it were, counsel asserted, more class members would have objected or opted-out. (See Transcript,

Under such circumstances the Court cannot determine the value of the settlement to the class and cannot hold that the proposed settlement is fair to the class.

*Non-Transferability of Credits*

It is undisputed that the Credits are not transferrable. This additional restriction on the Credits diminishes their possible value even further. While the Court understands that transferrable Credits are not an option in this case (Wines 'Til Sold Out asserts that state alcohol laws prevent transfer of Credits) the limitation nonetheless has a negative impact on the Credits' value.

*Class Members' Reaction to the Settlement*

"[C]ourts have looked favorably upon . . . benefits in which class members have demonstrated an interest." 4 Newberg on Class Actions § 12:13; (Girsh factor 2). Wines 'Til Sold Out emphasizes this factor, repeatedly asserting that "class members [i.e., their customers] want the credits" (Dkt No. 84, p. 16 of 18), but the evidence of class interest in using the Credits is exceedingly thin. Joseph Arking, Wines 'Til Sold Out's CEO, vaguely states in

_____

p. 34-35) The Court declines to draw such an inference, as many other reasons may lead class members not to actively participate in the settlement approval process. See In re Gen. Motors Corp., 55 F.3d at 812 ("a combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement.").

one sentence in his affidavit, "WTSO has already received multiple inquiries from customers seeking to use their credits, and I believe that WTSO's customers who completed Verification Forms are eager to use those credits." Arking Aff. ¶ 16 (Dkt No. 84-1) This evidence raises more questions than it answers, including, but not limited to: How many is "multiple"? Are the "multiple" inquiries from different customers or repeated inquiries from the same customer(s)? Are the inquiring "customers" class members? How many complaints has Wines 'Til Sold Out received about the Credits?

At the final approval hearing, the parties also argued that class interest may be measured by the decrease in purchases by class members. According to the parties, the Court should infer that the decrease is not a true decrease, but rather a delay-- i.e., customers are waiting to get their Credits before making purchases. (Transcript, p. 71-72) However, as some objectors have noted, an equally reasonable inference to be drawn is that the decrease in purchases is a true decrease resulting from class members' decision to stop purchasing wine from Wines 'Til Sold Out. (Id.) Notably, the parties have not submitted a single statement from a single class member-- not even from the named Plaintiffs-- stating the class member's interest in using the Credits. Thus, the Court lacks sufficient evidence to conclude that class members do, indeed, want to use the Credits.

*Reversion*

Reversion to the defendant of unclaimed settlement funds is generally disfavored. <u>In re Baby Prod.</u>, 708 F.3d at 172 ("Reversion to the defendant risks undermining the deterrent effect of class actions by rewarding defendants for the failure of class members to collect their share of the settlement."). As at least one objector has observed, any unclaimed Credits effectively revert to Wines 'Til Sold Out. Wines 'Til Sold Out argued at the final approval hearing that "[t]here is no reversion because there is no common fund" (Transcript, p. 76), but the Court disagrees. It is true that there is no common fund where Wines 'Til Sold Out has deposited cash. In that sense Wines 'Til Sold Out is correct that there will be no literal reversion. But this is so only because the money connected to the Credits never left Wines 'Til Sold Out in the first place. Perhaps the more appropriate term is "retained" rather than reverted, but the salient point is, at the end of the day the money will be with Wines 'Til Sold Out and not class members. The deterrent effect is still lost. This additional aspect of the Credits weighs against settlement approval.

(b) <u>Cash Fund</u>

Perhaps there is a way to structure a hybrid coupon / cash settlement such that each class member may reasonably expect to receive sufficient compensation-- either in the form of credit,

cash, or some combination-- but the parties have not persuaded the Court that the Amended Settlement Agreement achieves that goal. First, the Court shares the objectors' and the States Attorneys' General concerns regarding the size of the Cash Fund. The parties have presented no evidence from which the Court might conclude that $500,000 is sufficient, particularly in light of consumers' general preference for cash.[41] Indeed, the parties have not even explained to the Court how they calculated the $500,000 figure.

Second, the new provisions of the Second Amended Settlement Agreement only create further complications and questions. The parties explain that "to the extent that the $500,000 fund is not sufficient to cover the Class Members' unused Credits, any amount not awarded by the Court to Class Counsel will now also be available to pay the Class for unused Credits." (Dkt No. 97, p. 2 of 6) The problem is that no one will know what that unawarded attorney's fee amount will be until after the Redemption Period has expired.

Thus, even if the Cash Fund were sufficient-- either with the minimum balance of $500,000, or in some presently unknown larger amount-- the Court questions whether the addition of the cash option, regardless of the amount of cash, complicates the

_____

[41] Objector Duckett expressed his preference for cash during the final approval hearing. (Transcript, p. 102) Objector Taylor also states that he would prefer cash. (Dkt No. 103)

settlement to such an extent that any potential improvement (in terms of added value to the class) is effectively offset. The Amended Settlement Agreement / Second Amended Settlement Agreement is structured such that class members must choose between using their Credits within the Redemption Period or waiting until the Redemption Period has expired to get a pro rata distribution from the Cash Fund. Yet class members do not know how much their pro rata distribution will be when the choice must be made.[42] How is such a forced choice, based on insufficient information, fair to the class? This is another question the parties have not answered.

Third, it is not clear how the new Cash Fund alternative works in conjunction with the cash available to the no-ship class members. During the final approval hearing, the parties suggested that the Cash Fund for the no-ship members would remain separate. (Transcript, p. 31)[43] Assuming this is true, yet another question

---

[42] As noted supra, the parties assert that Class Members will "not be required to make a single decision between Credits or cash." (Dkt No. 97, p. 4 of 6) The Court disagrees. The decision whether or not to use the Credits is effectively a choice between Credits or cash because, as the parties themselves explain, unused Credits (in excess of $2.00) "automatically" convert to cash after the expiration of the Redemption Period. (Id.)

[43] In their post-hearing submission the parties also state that "[t]he failsafe Cash Fund is separate from any payments made by WTSO to Class Members to whom WTSO could not ship during the Redemption Period, pursuant to Paragraph J of the Revised Settlement." (Dkt No. 97, p. 4 of 6, n. 4)

for which the Court does not have an answer arises: what justifies treating no-ship class members differently than all other class members? As the Amended Settlement Agreement is presently drafted, no-ship class members who submit valid Verification Forms may request a cash payout (a) within the Redemption Period, and (b) such members are guaranteed "%50 of the amount of their Credits" (Dkt No. 43-1, p. 12 of 29), whereas all other class members who submit valid Verification Forms must (a) wait until the end of the Redemption Period to get (b) either 100% of the amount of their Credits (in excess of $2.00) or a pro rata cash payment for their Credits (in excess of $2.00), depending on the number of claims on the Cash Fund. (Dkt No. 83-1, p. 1 of 10)

Fourth, potential reversion exists. The Second Amended Settlement Agreement provides that "[i]f the total cash due to the Class Members is less than $500,000, up to the first $35,000 in excess shall be returned to Defendant," and thereafter, if additional cash remains after paying the total amount of unused Credits and attorney's fees, "any" of that "excess shall be returned to Defendant." (Dkt No. 97-1, p. 3 of 9) This aspect of the proposed settlement further highlights the Court's concern as to the complications created by the Cash Fund: either (1) the cash portion of the settlement is insufficient, which means less compensation to the class, or (2) it is not, resulting in a reversion, which rewards Wines 'Til Sold Out. Of course, the

third option is that the parties have very accurately predicted
the amount of cash claims (<u>i.e.</u>, the amount of unused Credits)
such that each class member opting for cash will get the maximum
amount of cash with very little left in the fund, rendering the
reversion *de minimus*. But as this Court has already explained,
the parties have given the Court no reason to find that this third
option is a likely outcome.

For all of these reasons, the Court concludes that the
addition of the Cash Fund option does not salvage the proposed
settlement from disapproval.

(c)  <u>Injunctive Relief</u>

The parties argue that "this case . . . ended the Defendants'
reference pricing scheme that led to the Settlement. That amounts
to real, quantifiable economic value." (Dkt No. 88, p. 14 of 68)

First, the parties do not attempt to place a dollar figure on
this asserted "real, quantifiable" value to the class. Second,
the States' Attorneys General correctly observe that the
"injunctive relief here rests on a definitional change on WTSO.com
that Defendant took over a year ago (pre-settlement), Dkt. 43-1 at
2, and was not identified as 'consideration of settlement' in the
proposed settlement agreement, see Dkt. 43-1 at 8-13, § IV." (Dkt
No. 68-3, p. 15 of 21 fn. 5) Thus, it is not clear to the Court
that the injunctive relief should be considered in the Court's
determination of whether the settlement is fair, reasonable and

adequate.  Assuming *arguendo*, however, that the Court may consider
this change in Wines 'Til Sold Out's behavior, which did come
about after the initiation of the instant suit, whatever value
this element adds to the value conferred on the class cannot
overcome the other deficiencies discussed in this Opinion.

## IV.  CONCLUSION

In sum, too many questions remain, and without answers, the
Court is unequipped to approve the parties' settlement.
Accordingly, for the foregoing reasons, the Motion for Final
Settlement Approval will be denied.  An appropriate Order shall
issue on this date.


                                        s/ Renée Marie Bumb
Dated: April 17, 2018         _____
                              RENÉE MARIE BUMB
                              UNITED STATES DISTRICT JUDGE